UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAP AG and SAP AMERICA, INC.,⁣ )
)
     Plaintiff, )     Case No. 1:11-cv-02648 KBF
)
v. )     (ECF CASE)
)
DATATERN, INC., )
)
     Defendant. )
)

## DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Plaintiffs' Contention:

1.     DataTern filed four actions, all in the Eastern District of Texas ("E.D. Texas"),

where at least some defendants in each action have been accused of violating the '402 Patent

and/or the '502 Patent based on their use of SAP's BusinessObjects products (the "Texas

DataTern Actions"). The first of these actions was filed on June 2, 2009. Complaint in

*DataTern, Inc. v. The Allstate Corporation et al* (09-cv-00178) [DI 1]; *DataTern, Inc. v. Staples,*

*Inc. et al.*, Case No. 10-cv-00133 (E.D. Tex.) [DI 1]; Complaint in *DataTern, Inc. v. Eli Lilly and*

*Company et al.*, Case No. 10-cv-00413 (E.D. Tex.) [DI 1]; Complaint in *DataTern, Inc. v. Abbott*

*Laboratories et al.*, Case No. 11-cv-00203 (E.D. Tex.) [DI 1].

Defendant's Response:

     Admitted.

Plaintiffs' Contention:

2.      DataTern served infringement contentions for the '402 Patent on multiple

defendants in the Texas DataTern Actions based on their use of SAP's BusinessObjects products.

*See* Exhibits A, B, D, and E to Declaration of Jeb B. Oblak ("Oblak Decl.").

Defendant's Response:

DataTern did not, in the ordinary course of litigation, serve EDTX Local Patent Rule

("P.R.") 3-1 infringement contentions on Bank of NY Mellon, BP American, Inc., Volkswagen

Group of America, Inc., and Eli Lilly & Company in which DataTern asserted SAP's

BusinessObjects product infringed DataTern's '402 patent (which are the subject of Exhibits A,

B, D, and E to the Oblak Decl.).  See Declaration of William E. Davis, III ("Davis Decl."), ¶¶ 1-

6.  In fact, Exhibits A, B, D and E to the Oblak Decl. are not infringement contentions but

illustrative preliminary claim charts that were prepared solely for confidential settlement

discussions between and among the parties.  See Declaration of John Caruso ("Caruso Decl."),

¶¶ 3-4; Oblak Decl, Ex. A (reference to "Subject to FRE 408"), Ex. D (cover letter reference to

"CONFIDENTIAL/SUBJECT TO RULE 408, FED. RULES OF EVID.) Ex. E (header and

footer reference "CONFIDENTIAL UNDER RULE 408; Subject to FRE 408").

Plaintiffs' Contention:

3.      DataTern's answer in this matter contained conditional counterclaims of

infringement of the '402 Patent as well as U.S. Patent No. 6,101,502 (the "'502 Patent").  The

counterclaims were conditioned on the Court's consideration of its Motion To Stay or Dismiss

this case.  DataTern's First Amended Answer and Counterclaims [#13].

Defendant's Response:

Admitted.

Plaintiffs' Contention:

4.      On July 2, 2011, DataTern filed a Motion to Stay or Dismiss Plaintiffs' Claims.

July 22, 2011 Motion [37 in 11-cv-23655].

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

5.      On January 31, 2012, the Court heard oral argument on DataTern's Motion to

Stay or Dismiss Plaintiffs' Claims, and indicated that it would deny DataTern's Motion.

Subsequently, the court did deny that motion.  February 15, 2012 Order [#43].

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

6.      On February 14, 2012, DataTern filed a Motion for Reconsideration of its Motion

To Stay or Dismiss.  February 14, 2012 Motion [#60 in 1:11-cv-02365].  That Motion was

denied.  April 23, 2012 Order [#65].

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

7.      On February 14, 2012, the Court issued a scheduling order requiring DataTern to

serve infringement contentions by March 16, 2012.  February 14, 2012 Order [#39].  This date

was negotiated by the parties and jointly proposed to the Court.  *See* Exhibit F to Oblak Decl.;

February 9, 2012 Order [#37].

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

      8.      On March 16, 2012, the parties submitted a joint request for, and the Court

granted, a one-week extension on DataTern's infringement contentions.  March 16, 2012

Endorsed Letter [#54].

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

      9.      On March 23, 3012, DataTern served upon Microsoft infringement contentions

based on both the '402 and '502 Patents.

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

      10.     On March 23, 2012, DataTern served upon SAP infringement contentions based

on the '502 Patent.

Defendant's Response:

      Admitted.

Plaintiffs' Contention:

      11.     As of the date of filing of this motion, DataTern has not served upon SAP

infringement contentions based on the '402 Patent.  Declaration of Edward R. Reines ("Reines

Decl.") ¶ 2.

Defendant's Response:

      DataTern admits that its March 23, 2012 infringement contentions did not include

substantive infringement contentions concerning SAP's BusinessObjects and the '402 Patent.

However, in its infringement contentions, DataTern noted that SAP had produced no technical information or source code, and specifically reserved the right to supplement and add infringement contentions based on SAP's production. Declaration of Daniel J. Kelly ("Kelly Decl."), Ex. 15. To this date, SAP has not produced all relevant source code and only within the last several weeks begun its production of technical documents associated with BusinessObjects. Kelly Decl., ¶¶ 17-18, 21.

<u>Plaintiffs' Contention</u>:

12.    On Wednesday, March 28, 2012, Edward Reines sent an email to Lee Bromberg. In it, Mr. Reines noted that SAP had received infringement contentions only based on the '502 Patent. Mr. Reines suggested that SAP was willing to dismiss its claim for declaratory judgment of invalidity of the '402 Patent in exchange for an appropriate covenant not to sue from DataTern. Reines Decl. ¶ 3; Exhibit A to Reines Decl.

<u>Defendant's Response</u>:

Exhibit A to the Reines Decl. speaks for itself.

<u>Plaintiffs' Contention</u>:

13.    After receiving no response, Mr. Reines initiated discussion of the issue with Mr. Bromberg via telephone. In the course of that telephone call, Mr. Bromberg told Mr. Reines that infringement contentions based on the '402 Patent would be "premature". Reines Decl. ¶ 4.

<u>Defendant's Response</u>:

Mr. Reines's description of the call is incomplete. In the call, Mr. Bromberg advised Mr. Reines that DataTern had drafted infringement contentions regarding the '402 Patent, but decided not to serve them because DataTern's counsel thought they should review SAP's documentation and source code provided in response to DataTern's discovery requests to

confirm infringement before finalizing DataTern's contentions. Mr. Bromberg said it would be premature to serve the contentions before DataTern had an opportunity to confirm infringement based upon the source code and documentation disclosed during discovery. Mr. Bromberg said that DataTern declined to dismiss its '402 claims because DataTern believed the evidence would establish a basis for infringement, and that DataTern intended to amend and/or supplement its contentions as soon as it was able to do so. Declaration of Lee Carl Bromberg (Bromberg Decl., ¶ 4. Mr. Reines had represented in a February 22, 2012 settlement conference that SAP was prepared to produce immediately SAP's source code to expedite matters and conform to the Court's schedule. Bromberg Decl., ¶ 2. SAP did not. Kelly Decl., ¶ 9.

Plaintiffs' Contention:

14.     Mr. Reines raised the topic with Mr. Bromberg via telephone a second time. Mr. Bromberg confirmed to Mr. Reines that DataTern viewed infringement contentions based on the '402 Patent as "premature". Reins Decl. ¶ 5.

Defendant's Response:

See response to Contention 13.


## ADDITIONAL MATERIAL FACTS TO WHICH DEFENDANT CONTENDS ARE UNDISPUTED


1.     DataTern is a wholly owned subsidiary of Amphion Innovations plc. For the last 25 years Amphion and its predecessors have been in the business of funding start-ups, with a special focus on medical products and software. Amphion's central strategy involves developing strong intellectual property in its start-up companies. Amphion's major successes in the medical products industry include MediSense and Celgene, both of which are publicly traded and

generate substantial revenues.  See Declaration of Richard C.E. Morgan  ("Morgan Decl."), at ¶ 2.

2.      Among its start-ups was a company called Ontos which, through its employees, invented the 402 and 502 patents.  Morgan Decl., ¶ 3.

3.      The 402 and 502 patents were the product of substantial investment and many years of development work.  The patents provided the pathway for software products that would facilitate data integration between systems with different legacy data structures.   Morgan Decl., ¶ 4.

4.      Ontos and another subsidiary, FireStar Software, Inc., which had acquired both patents from Ontos, attempted to commercialize the patents.  Subsequent to 2001, FireStar and Amphion determined that the market opportunities for each patent had been overwhelmed by the infringing activities of various others, effectively forcing FireStar to develop new products to save its business.  Morgan Decl., ¶¶ 5-7.

5.      In 2007, FireStar and Amphion agreed that FireStar should focus on building and selling new products and Amphion would attempt to recover at least some of the tremendous value of the 402 and 502 patents that had been misappropriated by others at great cost to Amphion and its investors.  As a result, DataTern was formed and various patent infringement suits were filed.  Morgan Decl., ¶¶ 7-8.

6.      DataTern filed its First Amended Answer and Counterclaims in this action on July 1, 2011.  [#13; 11-CV-02648].  This was preceded by a June 28, 2011 Initial Scheduling Conference where DataTern advised the Court that it would move to dismiss the action for lack of jurisdiction and standing by the plaintiffs or to stay the action in light of DataTern's request for re-examination before the USPTO of the '402 Patent.  DataTern characterized its

counterclaims as "conditional," contingent on the Court's determination as to whether it had

jurisdiction to go forward with the case. Those conditions were not met until this Court's

February 15, 2012 (citing Judge Holwell's ruling at a January 31, 2012 conference) and April 23,

2012 Orders [#43 and #65; 11-CV-02648] denying DataTerns Motion to Stay or Dismiss and

denying DataTern's Motion for Reconsideration of the same. Kelly Decl., ¶ 3.

       7.      On July 8, 2011, SAP served on DataTern its "Initial Disclosures Pursuant to Rule

26(a)(1)" ("Initial Disclosures"). Kelly Decl., Ex. 1. Citing Fed. R. Civ. P. 26(a)(1)(A)(ii),

requiring a party to "provide to the other parties . . . a copy – or a description by category, and

location – of all documents, electronically stored information, and tangible things that the

disclosing party has in its possession, custody, or control and may use to support its defenses . .

.," SAP identified among "the following categories of documents or things that may be in its

possession, custody, or control that it may use to support one or more of its claims or defenses. . .

.":

     5.   Technical documents concerning the design, development, and
         operation of SAP's BusinessObjects." (Kelly Decl., Ex. 1, pp. 5-6).

SAP represented that "[a]ll of these documents or things are located in the offices of Woodcock

Washburn LLP, Cira Centre, 12th Floor, 2929 Arch Street, Philadelphia, PA 19104 or at one or

more of SAP's United States locations (SAP America, Inc.'s corporate headquarters: 3999 West

Chester Pike, Newtown Square, PA 19703). Kelly Decl., Ex. 1, p. 7. Finally, SAP stated that it

reserved the right to withhold production of these documents which contain "trade secrets,

proprietary information, or other confidential information of SAP until this Court has issued a

protective order preserving the confidentiality of SAP's trade secrets and other proprietary

information during this litigation and thereafter." Kelly Decl., Ex. 1, p. 7.

3.      Seven months later, on February 3, 2012, and shortly following the Court's January 31, 2012 denial of DataTern's motion to dismiss or stay the action, counsel for SAP first raised the subject of a protective order, stating that they would send a "draft protective order" within the next few days with regard to concerns raised by DataTern regarding the production of its confidential documents.  Kelly Decl., ¶ 5, Ex. 2.  On February 7, 2012, SAP counsel attached a proposed protective order for review by DataTern counsel.  Kelly Decl. ¶ 5, Ex. 3.

4.      On February 14, 2012, the Court modified the original scheduling order in the matter and established a new Scheduling Order, providing, *inter alia*, for the service of DataTern's infringement contentions on March 16, 2012, and the close of fact discovery on July 18, 2012.  [#39; 11-CV-02648].

5.      On that same day, February 14, 2012, DataTern counsel engaged in a telephonic conference with SAP's and Microsoft's counsel, to discuss discovery in this matter, including the protective order and the parties' production of documents.  Kelly Decl., ¶ 6.

6.      During that conference, DataTern's counsel specifically asked SAP counsel when it would make available all technical documents concerning BusinessObjects, including source code which SAP had identified in its Rule 26(a)(1)(A)(ii) Initial Disclosures (served on July 8, 2011), which SAP had represented that it had within its possession, either at its or its counsel's offices.  Kelly Decl., ¶ 7.

7.      In that conference, SAP's counsel informed DataTern's counsel that SAP did not have these documents in its possession readily available for production and that it would not produce such documents until such time as it had received a document production request from DataTern seeking such documents.  Kelly Decl., ¶ 7.

8.      The following day, February 15, 2012, and based on SAP's and Microsoft's counsel's representations that they would not make available technical documents concerning the products at issue in the litigation, including BusinessObjects, DataTern served its First Request for Production of Documents on SAP and Microsoft, seeking, *inter alia*, all technical documents concerning BusinessObjects, including source code, which SAP had identified in its Initial Disclosures. Kelly Decl., ¶ 8, Ex. 4.

9.      On February 16, 2012, DataTern's counsel provided detailed comments and proposed revisions to the draft protective order provided by SAP on February 7, 2012.  Kelly Decl., ¶ 8, Ex. 5.

10.      On February 22, 2012 representatives of SAP and DataTern met for a settlement conference in Philadelphia.  That meeting was attended by DataTern counsel Lee Bromberg, William Zucker, and Erik Belt.  In addition to lawyers from Woodcock Washburn LLP, SAP was represented at the meeting by Ed Reines, from Weil Gotshall, who had not yet entered an appearance in the case. Bromberg Decl., ¶ 2.

11.      During the meeting, Mr. Reines advised Messrs. Bromberg, Zucker and Belt that SAP was prepared to produce immediately SAP's source code to expedite matters and conform to the Court's schedule, and suggested that the parties abandon the proposed protective order that was the subject of the February 14, 2012 discovery conference, and adopt, without revision, the standard order used by the U.S. District Court for the Northern District of California.  Bromberg Decl., ¶ 2.

12.      On February 24, 2012, DataTern's counsel had received no response from SAP to DataTern's comments on the proposed protective order nor any subsequent communications about the source code. Kelly Decl., ¶ 10.

13.     DataTern's counsel wrote SAP's counsel advising them that DataTern had received no comments on the protective order revisions, acknowledged their refusal to provide documents identified in SAP's Initial Disclosures, confirmed that they had served the document production requests, and advised them that we did not anticipate any delays in the production of the documents included in SAP's Initial Disclosures, given the representations concerning their whereabouts back in July 2011.  Kelly Decl., ¶ 10, Ex. 6.

14.     On February 27, 2012, SAP's counsel responded by advising DataTern counsel that it was now SAP's and Microsoft's position that the parties use the Northern District of California model protective order.  Kelly Decl., ¶ 10, Ex. 7.

15.     SAP's counsel confirmed his representations in the prior conference regarding the Initial Disclosures, stating "Plaintiffs are under no obligation to produce all documents listed under [the Rule 26(a)(1)(A)(ii) initial disclosures]," and that they had "begun" a document search and collection process (in response to our document production requests), and would produce "on a rolling basis as quickly as is reasonably possible." Kelly Decl., ¶ 10, Ex. 7.  This was contrary to Mr. Reines's representation in the February 22 conference that SAP was prepared to produce SAP source code, immediately and as soon as the parties reached agreement on a protective order.  Bromberg Decl., ¶ 2.

16.     By email dated February 28, 2012, DataTern's counsel pressed again for the production of documents identified in the Initial Disclosures.  Kelly Decl., ¶ 11, Ex. 8.

17.     DataTern's counsel also discussed in the February 28, 2012 email DataTern's concern about reviewing the as yet produced documents and source code in a timely fashion and our suggestion that DataTern be permitted to assemble a team in India to review such documents. Kelly Decl., ¶ 11, Ex. 8.

18.     By email dated March 1, 2012, SAP's counsel forwarded DataTern's counsel a copy of the Northern District of California model protective order.  However, contrary to Mr. Reines's position at the Philadelphia meeting, it was materially amended by means of a "no off shore" rider attached to it restricting review of all protected materials in the United States. Kelly Decl., ¶ 12, Ex. 9.

19.     On March 1, 2012, DataTern's counsel advised SAP's and Microsoft's counsel that DataTern would begin producing non-confidential documents and asked again for a date on which SAP and Microsoft would produce documents identified in their Initial Disclosures.  Kelly Decl., ¶ 12, Ex. 10.

20.     DataTern's counsel proceeded to diligently review the model order, as amended and discussed DataTern's proposed revisions in a March 5, 2012 discovery conference.  Kelly Decl., ¶ 13.

21.     By letter dated March 6, 2012, DataTern's counsel provided to SAP counsel DataTern's proposed revisions (many of which the parties were able to reach agreement on). Kelly Decl., ¶ 13. Ex. 11.

22.     In DataTern's counsel's letter of March 6, 2012, counsel urged SAP's counsel, consistent with Mr. Reines's statements in the Philadelphia meeting, to produce as soon as possible all documents identified in SAP's and Microsoft's initial disclosures, including source code and other technical documents pertaining, *inter alia*, to Business Objects.  Kelly Decl., ¶ 13, Ex. 11.

23.     On March 9, 2012, the parties had another discovery conference to discuss their remaining differences regarding the protective order.  In that conference, DataTern's counsel proposed that the parties agree on an interim protective order embodying all of the provisions the

parties agreed on to enable production of confidential documents to begin immediately. Kelly Decl., ¶ 14.

24.     At no time prior to the March 9, 2012 conference, had counsel for SAP proposed an interim protective order, counsel had proposed that the parties exchange documents based on an agreement that they would be treated "attorney's eyes only" until such time as the Court approved an order. This was not acceptable to DataTern because under this proposal there would be no Court order governing such production and protecting the parties. Kelly Decl., ¶ 14.

25.     As of March 9, 2012, SAP had still not indicated when it would produce any of its technical documents (which may or may not be considered confidential documents). Kelly Decl., ¶ 14.

26.     On March 12, 2012, SAP's counsel asked for DataTern to supply a proposed interim order for their consideration. Kelly Decl., ¶ 15, Ex. 12.

27.     On March 15, 2012, DataTern promptly supplied an interim protective order, and at the same time identified the areas of disagreement that remained between the parties. Kelly Decl., ¶ 15.

28.     The parties worked together to agree on the final terms of the interim protective order and a joint motion, and filed the motion and proposed order with the Court on March 30, 2012. [#75; 11-cv-02365]; Kelly Decl., ¶ 15.

29.     The Court endorsed the interim protective order on April 2, 2012. [#76; 11-cv-02365].

30.     The parties later filed joint letters with the Court on April 18, 2012, outlining their respective provisions with regard to the final protective order. Kelly Decl., ¶ 15, Ex. 13 and 14.

31.  DataTern's main concern, as expressed in its April 18, 2012 letter to the Court, was that it had not yet received any technical documents and source code from SAP and Microsoft, and that it could not timely review and digest the expected avalanche of documents and source code SAP and Microsoft were likely to produce without a skilled review team in India. Kelly Decl., ¶ 15, Ex. 14.

32.  The Court ultimately adopted the off shore restrictions embodied in SAP's and Microsoft's proposed final order in an Order dated April 23, 2012. [#79; 11-cv-02365].

33.  On April 5, 2012, SAP's counsel first addressed DataTern's requests for SAP technical documents, stating that they would "begin a rolling production of internal Microsoft and SAP document[s] next week." SAP's counsel also stated that that they had the "source code available for inspection at our offices in Philadelphia consistent with the interim protective order and Plaintiffs' responses to DataTern's first set of document requests." Kelly Decl., ¶ 17, Ex. 16.

34.  The first production of documents by SAP which contain any technical information did not occur until April 9, 2012. Kelly Decl., ¶ 18, Ex. 17.

35.  Since April 9, 2012, SAP has produced a vast amount of documents. The Bates count for these documents is up to 294,063. However, multiple documents are produced under a single Bates number, in native format and of file types that are not able to be reviewed in a typical litigation review tool such as CaseLogistics. Many of these files may only be reviewed or opened with the software that they are native to and in some cases, DataTern's counsel does not have those software applications readily available. Kelly Decl., ¶ 18, Ex. 17.

36.  On April 16, 2012, SAP produced to DataTern an external hard drive with 3,973 files on it, all produced under a single Bates number consisting of 15.2 gigabytes of information. Kelly Decl., ¶ 18, Ex. 17.

37.     On May 8, 2012, two days ago, SAP produced thirteen disks.  Nine of those contain software installs for certain SAP products, including BusinessObjects, the first time SAP has produced software for BusinessObjects.  Kelly Decl., ¶ 18, Ex. 17.

38.     Of the four remaining disks produced on May 8, 2012, one contains all native files with a total file count of 57,426 files, all produced under a single Bates number.  The other three contain 99,807 Bates numbered pages.  In addition, some of the records in the disk link out to zip folder files which contain multiple documents produced under a single Bates number. Kelly Decl., ¶ 18, Ex. 17.

39.     With regard to SAP source code, immediately following the Court's April 23, 2012 order denying DataTern's request for source code review in India, on April 24, 2012, DataTern provided to SAP the CV and other requisite information for Thomas J. Carter, a software consulting expert, pursuant to Section 7.4(a)(2) of the final Protective Order.  Kelly Decl., ¶ 19, Ex. 18.

40.     The protective order gives SAP and Microsoft up to 5 business days to object to the disclosure of protected material to a consultant designated by DataTern.  On the fifth business day, May 1, 2012 at 3:35 p.m., SAP's and Microsoft's counsel advised DataTern that they had no objections to Mr. Carter reviewing protected material.  Kelly Decl., ¶ 19.

41.     DataTern's counsel then made arrangements to have Mr. Carter review the source code allegedly available for review at SAP's counsel's offices on May 7, 2012.  Kelly Decl., ¶ 19, Ex. 19.

42.     Mr. Carter has been at SAP's and Microsoft's counsel's offices for this entire week reviewing source code.  Although Mr. Carter has been able to review some source code for SAP's products, code critical to formulating DataTern's '402 infringement allegations

(BusinessObjects versions 5.0, at a minimum) has still not been made available to DataTern.

Kelly Decl., ¶ 20, Ex. 20.

May 10, 2012

DATATERN, INC.
By its Attorneys,

_____/s/ Lee Carl Bromberg_____
Lee Carl Bromberg, BBO# 058480
Erik Paul Belt, BBO# 558620
McCarter & English, LLP
265 Franklin Street
Boston, Massachusetts 02110
Telephone: (617) 449-6500

## CERTIFICATE OF SERVICE

I certify that, on the above date, I served by electronic and first class mail true copies of this document on counsel of record for each other party.

_____/s/ Lee Carl Bromberg_____
Lee Carl Bromberg