# Weil, Gotshal & Manges LLP

**VIA HAND DELIVERY**

August 20, 2012

Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
+1 650 802 3000 tel
+1 650 802 3100 fax

**Edward R. Reines**
+650 802-3022
edward.reines@weil.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/20/12

Re: *SAP AG and SAP America, Inc. v. DataTern, Inc., No. 11-cv-2648-KBF*
    *Microsoft Corporation v. DataTern, Inc., No. 11-cv-2365-KBF*

Dear Judge Forrest:

SAP AG and SAP America, Inc. ("SAP") respectfully request a conference, pursuant to 2.F of the Court's Individual Practices and Local Rule 37.2, to discuss a motion to compel defendant DataTern's witness John Caruso for further deposition examination due to improper instructions not to answer questions in deposition. At the Caruso deposition, the parties had an exhaustive meet and confer regarding whether the instructions and refusals to answer were proper. *See, e.g.*, Caruso Depo at 157:7-12, 212:14-22.

**DataTern Improperly Prevents Discovery Into The Basis For Its Royalty Calculation**

In its response to SAP's interrogatory requesting DataTern's damages computation for the case, DataTern explained that it would apply its "standard royalty" calculation: "Royalty calculation: apply DataTern's standard royalty rate of 8% for the first $50 million of revenue, 6% for revenues between 50 million and 100 million and 4% to revenues over $100 million." DataTern's response to SAP's Interrogatory no. 13. In fact, no license to the '502 Patent has even been entered into at this rate; it is simply a "policy" adopted by DataTern after this litigation commenced. Morgan Deposition (Rough) ("Morgan Depo") at 230:16-231:2. DataTern's recently demoted CEO, John Caruso, confirmed in deposition that he was involved in creating this standard royalty structure. Caruso Deposition (Rough) ("Caruso Depo") at 209:18-211:2; *see also* Morgan Depo at 230:1-9. When Mr. Caruso was asked how that royalty structure was arrived at, DataTern's counsel instructed him not to answer because an attorney was allegedly involved:

> MS. LYNCH: Objection. I instruct you not to answer to the extent it involves any sort of work product of either counsel or outside experts. Any sort of privilege and to the extent your answer would be informed based on conversations with counsel or in connection with any sort of work product. If it's not, you're free to answer.

Caruso Depo at 210:2-212:2.

Hon. Judge Katherine B. Forrest  **Weil, Gotshal & Manges LLP**
August 20, 2012
Page 2

Far from obtaining its "standard royalty," the truth is that DataTern was granting licenses for as little as $50,000 in the context of its litigation campaign at the same time it adopted a "standard" 8% royalty for the first $50 million in revenue. *Id.* at 194:6-8. Mr. Caruso managed DataTern's licensing program. *Id.* at 146:20-147:1. He testified that he had a "formula" to determine the right price for each license. *Id.* at 156:13-17. When SAP attempted to learn the formula used to arrive at these non-"standard" licenses, questioning of Mr. Caruso was blocked: "No, and I'm not telling him not to answer. I'm just saying if it's going to in any way invoke a strategy or anything of that nature, then I'm instructing him not to answer. The rest of it I leave up to the witness." *Id.* at 156:19-157:17. The witness, Mr. Caruso, testified that he could not reveal the formula based on that instruction. *Id.* at 157:1-2, 158:4-5. DataTern's counsel made clear that Mr. Caruso was acting at DataTern as a business person, not a lawyer. *Id.* at 182:10-12 ("[H]e was acting in his capacity as a business person.").

Notwithstanding DataTern's refusal to reveal its formula, Mr. Caruso was selectively willing to disclose certain factors that went into determining the license amounts. To be sure, Mr. Caruso testified that these factors are independent of the underlying formula. *Id.* at 159:19-25. In fact, the factors that Mr. Caruso did identify were self-serving for DataTern. Mr. Caruso asserted that the economic value of the patents had nothing to do with the inexpensive licenses it issued. *Id.* at 196:2-12. Rather, one factor was DataTern's "cash position" and another was the supposed "widespread infringement." *Id.* at 158:16-21. Mr. Caruso did acknowledge that DataTern used the "cost of defense" of its target as a lever to pressure these low-value settlements. *Id.* at 176:10-12. Even with respect to this particular factor, Mr. Caruso could not describe "the extent to which cost of defense was a factor." *Id.* at 176:13-16. Despite discussing these factors, DataTern and Mr. Caruso steadfastly refused to disclose its formula for valuing its licenses.

**DataTern Should Be Required To Allow Legitimate Discovery Into Its Damages Position**

DataTern's attempt to shield relevant royalty-related information from discovery based on the attorney-client or other privileges is governed by Federal Circuit law. *See In re MSTG, Inc.*, 675 F.3d 1337, 1341 (Fed. Cir. 2012) ("[A]pply our own law in determining whether a privilege or other discovery limitations protect disclosure of information related to reasonable royalties."). "Whether the attorney-client privilege applies should be determined on a case-by-case basis." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803-04 (Fed. Cir. 2000). The "central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services." *Id.* The work product doctrine relates only to documents and other physical "material." *See* FRCP 26(b)(3).

"The widely applied standard for determining the scope of a waiver . . . is that the waiver applies to all other communications relating to the same subject matter." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005). "This broad scope is grounded in principles of fairness and serves to prevent a party from simultaneously using the privilege as both a sword and a shield; that is, it prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). "There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts

Hon. Judge Katherine B. Forrest  **Weil, Gotshal & Manges LLP**
August 20, 2012
Page 3

weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Fort James*, 412 F.3d at 1349-50.

As explained in the oft-cited decision in *Hercules v. Exxon Corp.*, 434 F. Supp. 136, 147 (D. Del. 1977), drawing privilege lines in patent case can be especially complex. *Id.* ("Many of the communications between the patent attorney and non-legal personnel of the corporation would therefore predominately reflect business concerns, such as the competitive position of the company, marketing strategy, licensing policy, etc."). However, the current circumstances establish in a straightforward way that the privilege was abused here.

First, DataTern's refusal to reveal the basis for its "standard" license terms, while simultaneously identifying those terms as the basis for its royalty position in discovery, is indefensible. No license exists under these terms; there must be some basis for them and that basis is properly discoverable. That the license terms were created while this litigation was pending makes DataTern's desire to hide their rationale from discovery more disturbing, rather than less. As explained above, Mr. Caruso, who was CEO of DataTern and ran its licensing program at the relevant time period, refused to explain how the "standard" royalty rate was "arrived at" and DataTern's counsel made clear that no testimony on this subject would be permitted. Caruso Depo at 211:6-212:2. In short, DataTern's royalty position is not immunized from discovery whether viewed as a business analysis unworthy of privilege protection or information for which any privilege has been waived by DataTern.

Second, DataTern has produced its settlement licenses. Leaving aside whether those settlement licenses are ultimately admissible at trial, discovery of the *formula* for computation of these licenses is not immunized from discovery. *Clear with Computers, LLC v. Bergdorf Goodman, Inc.*, 753 F. Supp. 2d 662, 663 (E.D. Tex. 2010) ("[T]he settlement communications are likely to be key in determining whether the settlement agreements accurately reflect the inventions' value or were strongly influenced by a desire to avoid or end full litigation."). There are several reasons for this. At the outset, a formula is a business metric, not legal advice, and therefore should be discovered. In addition, the basis for these settlement licenses, entered into at the same time as DataTern supposedly had a "standard" licensing structure, is warranted to test the probative value of its "standard" licensing rates. Beyond that, DataTern has self-servingly identified certain factors that it used to reach the settlement license amounts, such as cost of defense and financial distress. It should not be permitted to identify factors that led to the royalty amount, but not the formula it used to set the value in the first place.

Third, because DataTern has implicated the settlement licenses with its litigation positions and deposition testimony, the documents and reasoning related to those licenses should *not* be immunized from discovery. That would be manifestly unfair as it would allow DataTern to selectively use and explain those licenses as a sword while shielding relevant information about them from SAP.

**DataTern Should Be Ordered To Produce Relevant And Non-Immunized Information**

Based on the above, DataTern should be required to produce the following information:

1. John Caruso should be presented for deposition regarding: (1) DataTern's "standard" licensing

Hon. Judge Katherine B. Forrest  **Weil, Gotshal & Manges LLP**
August 20, 2012
Page 4

    structure, and (2) the formula used for its settlement licenses and *all* "factors" it uses to price licenses.
2. All documents relating to (1) DataTern's "standard" licensing structure, and (2) the formula used for its settlement licenses and *all* "factors" it uses to adjust that formula.

Respectfully submitted,

/s/ Edward R. Reines
Edward R. Reines
Counsel for Plaintiffs SAP AG and SAP America, Inc.

cc: Counsel for DataTern, Inc. (via electronic mail)