**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>DATATERN, INC.,<br><br>        Defendant. | Civil Action No. 1:11-cv-02648-KBF<br><br>**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF SAP AG AND SAP AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT** |
| SAP AG AND SAP AMERICA, INC.,<br><br>        Plaintiffs,<br><br>v.<br><br>DATATERN, INC.,<br><br>        Defendant. | ECF Case |

Pursuant to Local Rule 56.1, SAP AG and SAP America, Inc. (collectively, "SAP") respectfully submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment of Non-infringement of United States Patent No. 6,101,502 (the "'502 Patent") . The following are material facts as to which there is no genuine issue to be tried, and are supported by the citations to the record and exhibits accompanying the Declaration of Andrew L. Perito, filed concurrently herewith.

**Parties And Patents-in-Suit**

1.      Plaintiff SAP AG, a German corporation headquartered in Walldorf, Germany, is the world leader in enterprise software applications, which are designed to help companies make their business processes more efficient and agile and to enable real-time, effective decision-making.  SAP Complaint [D.I. 1] ¶¶ 4, 10.  SAP is the world's third-largest independent software manufacturer by market capitalization, with more than 109,000 customers in over 120 countries. *Id.*

2.      SAP America, Inc. oversees SAP's business and sales operations in the United States.  It employs more than 2,000 people in Newtown Square, Pennsylvania, and more than 10,000 people throughout the United States.  *Id.*  ¶ 5.

3.      In January 2008, SAP completed its acquisition of BusinessObjects and its software products.  SAP's BusinessObjects software provides a portfolio of business intelligence applications that allow business users to efficiently search and explore their company's data for business insight, analysis, monitoring, and reporting.  *Id.*  ¶ 12.

4.      DataTern was originally incorporated under the laws of the state of Delaware, is currently incorporated under the laws of the state of Texas, and has its principal place of business in New York City.  *Id.*  ¶ 6.

2

5.      DataTern is wholly owned by Amphion Innovations plc ("Amphion"), a publicly-traded, venture capital company incorporated under the laws of the Isle of Man, United Kingdom.  *Id.* ¶ 15.

6.      DataTern alleges it owns the '502 Patent, entitled "System for Enabling Access to a Relational Database from an Object-Oriented Program," and the '402 Patent, entitled "System for Enabling Access to a Relational Database from an Object-Oriented Program."  *Id.* ¶ 13.

7.      Amphion created DataTern for the purpose of holding, licensing and enforcing through litigation the '402 and '502 Patents.  *See id.* ¶ 16; DataTern's Amended Answer [D.I. 13] ¶ 16; Decl. of Richard C.E. Morgan [D.I. 81] ¶¶ 7-8.

**History Of The Litigation**

8.      Beginning in June 2009, DataTern brought suit against SAP customers in four different actions in the Eastern District of Texas:  *DataTern, Inc. v. The Allstate Corporation et al.* (09-cv-00178); *DataTern, Inc. v. Staples, Inc. et al.* (10-cv-00133); *DataTern, Inc. v. Eli Lilly and Company et al.* (10-cv-00413); and *DataTern, Inc. v. Abbott Laboratories et al.* (11-cv-00203).  *See* Defendants' Response to Plaintiffs' Statement of Material Facts [D.I. 86] at 1.  In these four cases, DataTern sued a total of 72 defendants for infringement of the '402 and/or '502 Patents, with numerous defendants in each action accused of infringement based on their use of SAP's BusinessObjects products.  *See id.*; SAP Complaint [D.I. 1] ¶ 28; DataTern's Amended Answer [D.I. 13] ¶ 28.

9.       Based on the settlement amounts and number of defendants sued, this litigation campaign was intended to garner cost-of-defense settlements against SAP's customers rather than litigate its infringement allegations against SAP, the real party in interest.  *See* Settlement Agreements for SAP Customers: Allstate [Perito Decl. Ex. A], BP [Perito Decl. Ex. C], Buy.com

[Perito Decl. Ex. D], BNY Mellon [Perito Decl. E], Regions Financial [Perito Decl. Ex. F], Eli Lilly [Perito Decl. Ex. G], Newell Rubbermaid [Perito Decl. H], Abbott Laboratories [Perito Decl. Ex. I].

10.    After receiving numerous indemnity requests from defendants in DataTern's patent infringement actions in Texas, SAP filed this action on April 18, 2011, seeking (1) a declaratory judgment that the '402 and '502 Patents are invalid; (2) that neither SAP nor any of its products infringe those patents; and (3) that SAP has neither contributed to nor induced the infringement of those patents by others.  SAP Complaint [D.I. 1] ¶¶ 32-48.

11.    SAP explained that DataTern alleged infringement against SAP's customers based on both patents in letters, claim charts, complaints, and infringement contentions.  *Id.* ¶¶ 28-31; *see also* Mem. of Law In Support of Mot. Partial Summ. J. of Non-Infringement [D.I. 67] at 3.

12.    DataTern then filed broad infringement counterclaims in this action, alleging infringement of the '402 and '502 Patents, by SAP and its customers, for their use of SAP's products, including BusinessObjects.  DataTern's Amended Answer & Counterclaims [D.I. 13] ¶¶ 12, 17.  In its answer to SAP's declaratory judgment claims, DataTern acknowledged that it sent SAP's customers "claim charts showing infringement of the '402 and/or '502 patents."  *Id.* ¶ 28.  DataTern also admitted that it "contacted from time to time defendants in the various litigations currently pending in Texas, including Volkswagen [an SAP customer], and has delivered to such defendants claim charts showing infringement of the '402 and/or '502 patents." *Id.* ¶ 29.

13.    DataTern labeled its counterclaims "conditional" pending this Court's determination that it had jurisdiction and should go forward with this case.  *Id.* at p. 6.  These

4

conditions were met by the Court's Orders denying DataTern's Motion To Stay or Dismiss and denying DataTern's Motion for Reconsideration of the same.  Feb. 15, 2012 Order [D.I. 43]; April 23, 2012 Order [D.I. 65].

14.     DataTern failed to serve infringement contentions on SAP pursuant to the '402 Patent.  *See* Declaration of Edward R. Reines ("Reines Decl.") [D.I. 69] ¶ 2.  When SAP asked for a covenant not to sue that would prevent DataTern from suing SAP customers on the '402 Patent based on their use of SAP's products, DataTern repeatedly responded that it was "premature" for it to serve contentions based on the '402 Patent.  *Id*. ¶ ¶ 4-5 & Ex. A.

15.     In light of DataTern's abandonment of its '402 Patent infringement counterclaims, SAP moved for summary judgment.  SAP's Mot. Partial Summary Judgment [D.I. 66].  The Court granted SAP's motion in its June 27, 2012 Order [D.I. 159].

16.     On August 24, 2012, the Court issued its *Markman* Order [D.I. 151].

17.     Five days later, DataTern conceded in a letter to the Court that it could not prove infringement in light of the Court's claim constructions.  DataTern's Letter to the Court, Aug. 29, 2012 [Perito Decl. Ex. K].

18.     Pursuant to the Court's August 30, 2012 Order [D.I. 152] asking the parties to provide input on how best to proceed in light of DataTern's concession, Plaintiffs SAP and Microsoft proposed a schedule for the deposition of DataTern's expert Mr. Neeraj Gupta, followed by summary judgment motions brought by SAP and Microsoft.  *See* Plaintiffs' Letter to the Court, Sept. 7, 2012.  [Perito Decl. Ex. L].

19.     DataTern opposed Plaintiffs' proposal in a responsive letter to the Court, *see* DataTern's Letter to the Court, Sept. 10, 2012 [Perito Decl. Ex. P], to which Plaintiffs replied, *see* Plaintiffs' Reply Letter to the Court, Sept. 11, 2012 [Perito Decl. Ex. O].

20.     DataTern also submitted a counter-proposal, *see* DataTern's Letter to the Court, Sept. 7, 2012 [Perito Decl. Ex. M], and filed its Request for Entry of Declaratory Judgment Of Non-Infringement and for Dismissal Without Prejudice of Plaintiffs' Invalidity Claims [D.I. 153].

21.     The Court approved Plaintiffs' proposed schedule for deposition and summary judgment briefing and ultimately denied DataTern's Request.  Sept. 17, 2012 Endorsed Letter Order [D.I. 157]; Oct. 4, 2012 Order [D.I. 159].

**SAP's Accused Products And The Asserted Claims Of The '502 Patent**

22.     The current release of SAP's BusinessObjects is marketed as SAP BusinessObjects Business Intelligence 4.0, and prior major releases of the software accused by DataTern include BusinessObjects Enterprise XI 3.1, BusinessObjects Enterprise XI 3.0, BusinessObjects Enterprise XI R2.  *See* Prabel Dep. Exh 1 [Perito Decl. Ex. Q].  Mr. Gupta refers to all of these accused versions in his report as "BusinessObjects XI."  *See* Gupta Report ¶ 233 ("I use the term 'BusinessObjects XI to refer to BusinessObjects XI R2 and later versions (and derivatives) . . . .").

23.     The '502 Patent is directed to the problem of mapping an object-oriented software application to a relational database—specifically, "to resolve issues related to the object-relational mismatch."  DataTern's Opening Claim Construction Brief [D.I. 88] at 4.

24.     The '502 Patent purports to solve this problem of the object-relational mismatch by providing a "mapping between an object model and a relational database" and then using this mapping to generate "interface objects" that are used by a "runtime engine" to "facilitate access to the relational database by object-oriented software application."  '502 Patent [D.I. 90-1], abstract.

25.     The database-access functionality provided by the generated "interface objects" of the '502 Patent involves "perform[ing]" both "read and write operations on the database." *Id.* at 1:64-65.

26.     The alleged invention of the '502 Patent is intended to simplify the lives of software developers needing to access relational databases in their programs. *Id.* at 1:66-2:5 ("[N]either programmers nor software applications need have knowledge of the database structure, the database programming interface, database security, or the database transaction model in order to obtain access to the relational database.").

27.     The purpose of BusinessObjects is to expose the data in a relational database to a non-technical business user in ways that allow the user to access, analyze, and present that data more effectively without the business user having to learn and employ programming instructions. BusinessObjects "uses a 'Universe' file that 'provide[s] an easy to use and understand interface for non-technical Web Intelligence users to run queries against a database to create reports and perform data analysis.'" Gupta Report ¶ 238 (quoting the BusinessObjects XI Universe Designer guide at 17).

28.     BusinessObjects' technology never permits a user to write data to the underlying relational database. Cacheux Dep. at 146:15-19 [Perito Decl. Ex. J].

29.     BusinessObjects software has never attempted to solve the problem at the core of the '502 Patent—the so-called object-relational mismatch. *Id.* at 144:20-145:2.

30.     DataTern's counterclaims broadly assert infringement of the '502 Patent by SAP and by third parties—including SAP's customers—based on the manufacturing, use, sale, and offers to sell software products, including certain SAP software. DataTern Amended Answer & Counterclaims [D.I. 13] at p. 8-9; *see also* Gupta Report ¶¶ 534-36.

31.     SAP's declaratory judgment for non-infringement is correspondingly broad.  SAP Complaint [D.I. 1] ¶ 1 ("SAP's BusinessObjects [] does not infringe the '402 or '502 patents, nor has SAP infringed [] the '402 or '502 patents."), ¶ 47 ("Neither SAP nor its products have infringed [] the '502 patent.").

32.     DataTern's expert report asserts only that—and only under DataTern's proposed claim constructions—use of SAP's BusinessObjects infringes claims 1, 2, 7, 19, and 25 of the '502 Patent.  Gupta Report ¶¶ 489.

33.     DataTern concedes that SAP's products do not infringe claims 1, 2, 7, 10, 11, 16, 19, 25, 28, or 41 of the '502 Patent under the Court's claim constructions.  Gupta Report ¶ 318; Gupta Dep. at 9:20-10:4 [Perito Decl. Ex. A]; *see also* Gupta Report ¶ 526.

**Expert Witness Report of Mr. Neeraj Gupta and Non-infringement**

    **A. "Selecting An Object Model"**

34.     Each of the independent claims requires the step of "selecting an object model." '502 Patent [D.I. 90-1], Claims 1 & 10.

35.     The Court construed the term "object model" to mean "a template with a predetermined standardized structure both relating to an object-oriented software application and including object classes and inheritance relationships among classes."  Claim Construction Order [D.I. 151] at 31.

36.     The parties agree that a "class" or "one or more object classes" means "[a / at least one] definition that specifies attributes and behavior of objects, and from which objects can be instantiated."  Joint Claim Construction and Prehearing Statement [D.I. 92] at 2.

37.     DataTern admits that the "object model" limitation as construed by the Court is not met by SAP's BusinessObjects.  *See* Gupta Report ¶ 526.

8

38.     Mr. Gupta admits that in his opinion, there is insufficient evidence that the accused "object model" of SAP's products includes inheritance relationships among its "classes," as required by the Court's construction of "object model."  Gupta Dep. at 14:15-19 [Perito Decl. Ex. A]; *id.* at 57:16-18.

39.     Mr. Gabriel Oancea, who wrote the '502 Patent and is a named inventor, conceded during his deposition that the figures of the '502 Patent (including figure 3 depicting an "object model") and its provisional application are consistent with the requirement that the "object model" includes object classes that specify the behavior of objects.  '502 Patent; Oancea Dep. At 48:17-55:1 [Perito Decl. Ex. N].

40.     Mr. Gupta testified that, at a minimum, he did not believe there was sufficient evidence that the "classes" of the accused products specified the behavior of objects.  Gupta Dep. at 22:21-23:12 [Perito Decl. Ex. A]; *see also id.* at 23:17-20.

41.     Mr. Gupta admitted at his deposition that his analysis "in the alternative" in paragraph 494 of his report (that is, under DataTern's proposed "object model" construction) does not use the parties' agreed construction of "class."  Gupta Dep. at 19:4-23.

42.     Mr. Gupta's alternative opinion relies on the usage of "class" found in SAP's Universe Designer Guide.  *Id.*; Gupta Report ¶ 250 (relying on the BusinessObjects XI Universe Designer guide, available at

http://help.sap.com/businessobject/product_guides/boexir31SP2/en/xi31_sp2_designer_en.pdf,

for its definition of "class").  A BusinessObjects class is a "container of objects" akin to a "folder in the Windows environment." *See* BusinessObjects XI Universe Designer guide at 303.

**B. "To Create At Least One Interface Object"**

43.     Both independent claims of the '502 Patent include the limitation "to create at least one interface object" (the "Interface Object Term").  '502 Patent [D.I. 90-1], Claims 1 & 10.

44.     The Court construed the Interface Object Term to mean "to generate code for at least one class and instantiate an object from that class, where the object is not part of or generated by the object oriented application and is used to access the database."  Claim Construction Order [D.I. 151] at 31.

45.     DataTern admits that the Interface Object Term as construed by the Court is not met by SAP's BusinessObjects.  Gupta Report ¶ 526.

46.     In DataTern's Expert Report, Mr. Gupta identifies BusinessObjects's Query object as the "interface object" of the '502 Patent's claims.  Gupta Report ¶¶ 500-504.

47.     Mr. Gupta testified during his deposition that "[i]n my investigation of the way query objects were created, the SAP BusinessObject system did not generate code for at least one class and then instantiate a query object from that class."  Gupta Dep. at 48:25-49:3 [Perito Decl. Ex. A].

48.     Mr. Gupta conceded that he was unable to find evidence that Business Objects generates code for any class at all, under the parties' agreed construction of "class."  *Id.* at 49:6-15.  Accordingly, Mr. Gupta admits the Interface Object Term "cannot be met by the SAP products that I analyzed."  *Id.* at 56:14-20.

49.     Mr. Gupta also admitted that the claim limitation of "a code generator … to create at least one interface object" cannot be met by SAP's accused products under the agreed

definition of "code generator," that is, "software that creates other software code."  Gupta Dep. at 38:22-39:23 [Perito Decl. Ex. A].

50.     DataTern's Expert Report admits that none of claims 10, 11, 16 or 28 are infringed by SAP's products, and no longer asserts that such claims are satisfied even under DataTern's own proposed constructions.  Gupta Report ¶¶ 319, 489.

51.     DataTern no longer alleges that claim 41 is infringed by SAP's products, *see id.*, and Mr. Gupta admitted that he "found insufficient evidence to cause me to conclude that the BusinessObjects XI Universe Designer created schema in the database," as required by that dependent claim, Gupta Dep. at 38:9-16 [Perito Decl. Ex. A].

### C. "[At Least One Interface Object] Associated With An Object Corresponding To A Class Associated With The Object-Oriented Software Application"

52.     The Court construed the claim term "[at least one interface object] associated with an object corresponding to a class associated with the object-oriented software application" (the "Associated-With Term"), which is present in both independent claims, to mean "the interface object (as defined above) corresponds to an object instantiated from a single class associated with the object oriented software."  Claim Construction Order [D.I. 151] at 31.

53.     The Gupta Report states: "Instances of Query objects are associated with, and are used by and with, objects instantiated within the object-oriented software application.  Examples of such objects corresponding to classes associated with BusinessObjects XI client applications include QuerySpecification, DataProvider, and DocumentInstance objects."  Gupta Report ¶ 503.

54.     Mr. Gupta admitted during his deposition that the Query object is associated with objects instantiated from numerous classes.  Gupta Dep. at 71:1-4, 8-10 [Perito Decl. Ex. A].

55.     The Query object relates to numerous objects instantiated from numerous classes, just as any object in a non-trivial object-oriented software application does.   Gupta Dep. at 72:8-12; 72:14-73:6 [Perito Decl. Ex. A]; Gupta Report ¶ 503; Hosking CC Decl. [D.I. 91] ¶ 33.

**D. "Runtime Engine"**

56.     Each independent claim of the '502 Patent requires "a runtime engine [which/that] invokes said at least one interface object [] to access data from the relational database" (the "Runtime Engine Term").  '502 Patent [D.I. 90-1], Claims 1 & 10.

57.     The Court construed the Runtime Engine Term to mean "[s]oftware that (i) the object oriented software application depends on to run, (ii) must be running to execute the object oriented software application, (iii) uses the map in its processing, and (iv) is not part of the object oriented software application."  Claim Construction Order [D.I. 151] at 31.

58.     DataTern concedes that SAP's products do not meet the Runtime Engine Term as construed by the court.  Gupta Dep. at 78:19-79:2 [Perito Decl. Ex. A]; Gupta Report ¶ 526.

59.     Mr. Gupta admitted that SAP's BusinessObjects does not meet part (i) of the Court's construction of the Runtime Engine Term.  Gupta Dep. at 157:14-17, 158:4-10

**E. Doctrine Of Equivalents**

60.     Mr. Gupta's expert report discloses no opinion regarding infringement by SAP's products under the doctrine of equivalents.  Gupta Dep. at 76:7-10 [Perito Decl. Ex. A]; *see generally*, Gupta Report.

61.     Mr. Gupta admitted in his deposition that he did not offer any opinions under the doctrine of equivalents because he concluded that the doctrine would not be satisfied for the limitations that he conceded are not met under this Court's claim construction order.  Gupta Dep. at 76:11-18; 76:12-14.

Dated:  October 26, 2012                    Respectfully submitted,

                                            /s/ Edward R. Reines_____ _____
Aleksander J. Goranin (*pro hac vice*)      Edward R. Reines (*pro hac vice*)
Steven Rocci (*pro hac vice*)               Andrew L. Perito (*pro hac vice*)
Erich M. Falke (*pro hac vice*)             Evan N. Budaj (*pro hac vice*)
WOODCOCK WASHBURN LLP                        WEIL, GOTSHAL & MANGES LLP
Cira Centre, 12th Floor                      201 Redwood Shores Parkway
2929 Arch Street                             Redwood Shores, CA 94065-1134
Philadelphia, PA 19104                       Telephone: (650) 802 3000
Tel. (215) 568-3100                          Facsimile: (650) 802 3100

                                            Douglas McClellan (*pro hac vice*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            700 Louisiana, Suite 1600
                                            Houston, TX 77002-2755
                                            Telephone: (713) 546 5000
                                            Facsimile: (713) 224 9511

                                            Timothy E. DeMasi
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, NY 10153
                                            Telephone: (212) 310-8000
                                            Facsimile: (212) 310-8007

                                            **Attorneys for Plaintiffs-Counterclaim
                                            Defendants**

                                            *SAP AG and SAP America, Inc.*