CCEZSAPM                          Motion

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  SAP AG, et al.,

4               Plaintiffs,

5         v.                              11 CV 2648 (KBF)

6  DATATERN, INC.,

7               Defendant.

8  ------------------------------x

9                                      December 14, 2012
                                       1:00 p.m.
10
   Before:
11
                    HON. KATHERINE B. FORREST,
12
                                       District Judge
13
                         APPEARANCES
14
   EDWARD REINES
15 ANDREW PERITO
   ALEKSANDER GORANIN
16      Attorneys for Plaintiffs

17 SCOTT J. NATHAN
   JOHN CARUSO
18      Attorneys for Defendant

19 DANIEL GOETTLE
        Attorney for Microsoft
20

21

22

23

24

25

CCEZSAPM                    Motion

1           THE DEPUTY CLERK:  All rise.

2           THE COURT:  Hi, good afternoon everyone.  Please be

3    seated.

4           (Case called)

5           MR. REINES:  Edward Reines and Andrew Perito for

6    plaintiff SAP.

7           THE COURT:  Good afternoon.

8           MR. GORANIN:  And Aleksander Goranin also for

9    plaintiff SAP.

10          MR. NATHAN:  Good afternoon, your Honor, Scott Nathan

11   for DataTern.  With me is John Caruso.

12          THE COURT:  All right, and no one is here from

13   Microsoft today?

14          MR. GOETTLE:  Your Honor, we actually have a gentlemen

15   in the back from Microsoft.

16          THE COURT:  All right, you don't want to move on up?

17          MR. GOETTLE:  If you want me to, your Honor, I'm happy

18   to.

19          THE COURT:  You guys took seriously the fact that the

20   only motion that was on was the motion to enjoin.

21          MR. GOETTLE:  We did, your Honor.

22          THE COURT:  Did you?  Because I was actually thinking

23   of coming out here and starting off by saying that if you

24   guys -- sometimes people are over prepared, you know, and I

25   thought maybe I'll deal with a couple of the other motions too.

CCEZSAPM                    Motion

1          MR. GOETTLE:  Yes, your Honor.

2          THE COURT:  Are you ready for that?

3          MR. GOETTLE:  I think I am, your Honor.  Dan Goettle

4    for Microsoft.

5          THE COURT:  All right.  I won't put you on the spot in

6    terms of arguing the depth of the motion, but I have a few

7    points that I might make on some of the other motions that

8    maybe you'll be helpful on.  Sorry about that.  But, you know,

9    this is what happens.

10         You guys are wondering what's going on.  What I was

11   saying is there are five pending motions, let me just go

12   through them.  We've got the Microsoft SAP motions for summary

13   judgment.  We've got the DataTern related motion for relief

14   pursuant to 56(d).  We have the DataTern motion to amend the

15   counterclaims.  We have SAP's motion to enjoin DataTern's

16   assertion of infringement of BusinessObjects products.  That's

17   the motion we're really here primarily to deal with today, but

18   I got a couple other points on the other motion I might make.

19         And then the last motion is the motion to clarify the

20   Court's June, I think it was, rule, and that I think I can just

21   clarify.

22         Yes.

23         MR. NATHAN:  Your Honor, with regard to any motion

24   that is not the preliminary injunction motion, and as I

25   understand it from yesterday afternoon, perhaps a couple

CCEZSAPM                    Motion

1    questions related to the motion for clarification.  To the

2    extent you're inclined to start getting into some of the other

3    materials, there are other people are not here, specifically

4    with the understanding that that wasn't going to be heard.

5              THE COURT:  That's fine.  And really on the other

6    ones, I'm really just going to be raising some questions, not

7    expecting argument.

8              MR. NATHAN:  Okay.

9              THE COURT:  It's just that people may want to be --

10   they may be able to respond to whether or not Microsoft might

11   and SAP might withdraw the other two arguments on partial

12   summary judgment, not having them argue, that's a preview, not

13   having them argue the motion for summary judgment.  I just want

14   to ask them whether they would withdraw those other two

15   arguments.  If so, it renders moot the 56(d) motion, which you

16   folks have made.  It doesn't require any argument.  It's just

17   like a yes or no question.  And then it also allows me to enter

18   summary judgment on the record because of where we are in terms

19   of the claim construction.  So I just previewed for you folks

20   some of the issues we'll be, I'll be raising.

21             So the motion that we're -- those are the five motions

22   we have on.  The motion I want to spend some time on is the

23   motion to enjoin.  That's the motion that we really are here

24   for today, then we'll get to the other motions towards the end,

25   really just to sort of see if we can cleanup a few things more

CCEZSAPM                    Motion

1    than anything else.  If we can't, we can't, and I'll just

2    decide them.  I've read them, and we'll just go through it.

3    But if there are easy fixes to a few of these things, then I'd

4    like to be able to do that.

5           Now, on the motion to enjoin, let me just raise a

6    couple of points and have you folks address them.  I apologize

7    for not getting out questions in advance.  I do try to do so

8    usually, but I've been on trial this week and it's been a

9    little crazy.

10          But DataTern says that for these cases that are

11   currently proceeding, the discovery would have to occur even if

12   the New York, my claim construction case, my claim construction

13   ruling was upheld.  They say that on page seven of their

14   papers.  If that's true, that their -- and it goes along with

15   another point, which is that the infringement claims take into

16   account my claim construction -- that's another thing that

17   DataTern's asserted.  That's on page nine of their papers.  And

18   then they also say that these customers are doing other things.

19   That's on page 13.  And they say also that, therefore, under

20   the Katz case and other cases, the customer suit exception

21   should be applied narrowly, and Katz wouldn't really apply here

22   because one case is not really dispositive of another.  So

23   those are some of the take aways that I get from the DataTern

24   papers.  I know I didn't have a reply time here in this, and so

25   that's what I'll want to have addressed.

CCEZSAPM                          Motion

1            But I think I'd also want to turn around and actually

2    start with a different point, which is irreparable harm.

3    Because it strikes me that the request that came in to SAP, and

4    then has caused concern, relates to a request -- I'm not even

5    sure -- for indemnification, but it did strike me in the manner

6    in which it was presented as potentially amenable to resolution

7    through money damages at a later point, money damages at a

8    later point in time should there be a need to address it, as

9    opposed to enjoining a sister court, a federal court which

10   appears to have looked at precisely the request for a stay

11   that's now being presented to me.  In other words, when I read

12   through the history, there was a stay, then there wasn't.  And

13   folks briefed and argued whether there should or should not be

14   a stay in light of my ruling on claim construction.  So it's

15   not as if we're in a situation where the Texas court wasn't

16   fully aware I think of what it was doing.  It proceeded as it

17   saw fit.  So I guess I'm wondering why that shouldn't be

18   accorded a fair amount of deference.

19           So why don't we, with that, Mr. Reines, why don't you

20   start.  It's really in the nature almost of a reply, if you

21   will, to what DataTern has said.

22           MR. REINES:  Yes, your Honor.  And I'm not one to use

23   slides in a rigid way, but I think that these are tuned

24   effectively to walk us through the reply, and they're targeted

25   at the issues that the Court raised.

1          Let me start by thanking the Court for proceeding on

2     an expedited basis midst trial and a crowded docket in general.

3     At the outset I wanted to offer the letter that we had

4     identified as the basis for acting expeditiously ourselves, for

5     the Court on an in-camera basis.  There's concerns about

6     privilege and also that there -- this person's negotiating with

7     DataTern right now, so maybe it's --

8          THE COURT:  Is there anyway you could redact the name

9     of the individual and also have it go to the other side on an

10    agreement of no waiver assertion, and that way they can at

11    least see it?  I hate to receive things that they can't see.

12         MR. REINES:  Understood, your Honor.

13         THE COURT:  When it's so fundamental to a motion to

14    enjoin them.

15         MR. REINES:  Understood.

16         THE COURT:  Let me have --

17         MR. REINES:  That's acceptable.

18         THE COURT:  Okay, let me note for the record, the

19    Court has not seen the document that is in Mr. Reines' hands.

20    So what Mr. Reines will do is redact the name and identifying

21    information of the particular customer.  And then if you folks,

22    you know, Mr. Nathan, Mr. Caruso would accept it on the basis

23    that you won't assert a waiver of attorney-client privilege

24    with respect to the document, if there was a privilege which

25    could attach, something about which I'm not going to rule one

CCEZSAPM                         Motion

1   way or the other not having seen it, then we'll be able to get

2   it in your hands as well.

3           MR. NATHAN:  We don't have an issue with that.  Thank

4   you, your Honor.

5           THE COURT:  All right.

6           MR. REINES:  So I'll see if my colleague can magically

7   redact pursuant to that.

8           THE COURT:  Did anybody bring any redacting tape?  An

9   extra A if you brought redacting tape or whiteout.  That would

10  be an extraordinary thing.  So if Mr. Goettle actually brought

11  redacting tape or whiteout, then you get an A plus.

12          All right, please proceed.

13          MR. REINES:  All right, thank you.

14          So the first question is, does SAP deserve protection

15  from interference with its customers' use of its

16  BusinessObjects products.  And this goes to the irreparable

17  harm question that the Court raised.  And then the second

18  question is the scope of any injunction, which really goes,

19  frankly, your Honor, directly to your second question which you

20  stated first, which is is there something more than just the

21  normal use of BusinessObjects at issue here that warrants the

22  necessity of a Texas proceeding in any event or that's an

23  exception to the Katz case.  So those are really your two

24  questions in a different order.

25          Why don't we go to the next line.  So there is no

CCEZSAPM                    Motion

disagreement that we're basically at a final judgment now.

DataTern's conceded on four independent grounds.  The Court has

that, those papers, the briefing's now in the can.  So we're

at, I think effectively we're at final judgment.

      Really I think the real guidance that we have, the

best authority is Kessler now that we're at this stage.  It's

not really a which case is more efficient to proceed in sort of

navigating a judicial efficiency kind of transfer style issue.

It's really a Kessler question.  And in Kessler made clear that

if you prevail as a manufacturer, you're entitled to relief,

equitable relief to enjoin actions against your customers.

      THE COURT:  So let me just ask you, because obviously

that is a fundamental case that the Court looks to for guidance

in this situation.  But I assumed this was raised before the

Court in Texas.  And this brings to mind one of the points that

DataTern seems to be saying in a different places that I cited

in its papers.

      MR. REINES:  Right.

      THE COURT:  Which is that it's not -- the actions

aren't on all fours exactly with what's been disposed of by my

ruling; that the customers are doing additional things.

      MR. REINES:  That's the question too.  But the first

question is, what about the customers to the extent they're not

doing extra things.  And Kessler is point blank, Supreme Court

case, good authority, never questioned -- we'll get to the

1    federal circuit's application of it.

2            THE COURT:  But are there any?  Because the other

3    thing that DataTern says in its papers is that their expert,

4    who put in the infringement contentions, did so taking into

5    consideration the claim construction rulings of this Court, and

6    that in taking those into consideration was still, nonetheless,

7    able to put out infringement contention.  So I'm wondering

8    maybe just tell me, are there any people who fall into this

9    category?

10           MR. NATHAN:  Yes.  And just so -- I think we said this

11   in the papers.  The documents that were sent out to the Texas

12   customers recently have nothing to do with BusinessObjects.

13   Those papers, those papers made claims of Microsoft products.

14           THE COURT:  Right.  So what I'm wondering, and maybe

15   your yes missed my question, because maybe my question wasn't

16   clear.  Are there any customers that you have sued whose

17   lawsuits against them, if they were brought in front of me and

18   marked as a related action, I would immediately enjoin based

19   upon the fact that it's covered by my Markman ruling and,

20   therefore, there could be no infringement.  Are there any

21   customers who fall into that category?

22           MR. NATHAN:  We understand, and discovery's been

23   limited in Texas because of the stays, so we understand that --

24   what I'm comfortable saying is virtually all of the remaining

25   defendants -- and there are, I'm going to say a dozen or less

CCEZSAPM                    Motion

1    remaining defendants in all of the Texas actions -- are

2    involved with some infringement that has nothing to do with

3    what we have characterized here as using BusinessObjects off

4    the shelf; in other words, getting their product, loading it

5    and using it.

6            THE COURT:  Okay, so let me -- I'm sorry, I'm going to

7    interrupt you for a minute, Mr. Nathan.  I just want to see

8    whether or not in my mind I got the right issues, because this

9    may intersect with the motion to clarify the June ruling.

10           If the June ruling on '402, which granted summary

11   judgment because there hadn't been infringement contentions put

12   in, if my clarification was to be that it's broader than just

13   BusinessObjects, it relates to inter alia BusinessObjects but

14   in fact the claim as brought is broader than BusinessObjects --

15   it was actually quite broad -- if my ruling says it's not just

16   BusinessObjects, does that change your answer?  So, in other

17   words, does the motion to clarify intersect directly with this

18   point that you're making?  I can put it differently.  Are there

19   any claims against these customers that don't involve '402,

20   patent ''402?

21           MR. NATHAN:  Yes.  I mean, the claim, the claims in

22   Texas involve so that -- maybe I can step back for a second.

23   So all of the lawsuits at issue in Texas contain allegations of

24   both '402 infringement and '502 infringement.  And the

25   infringement contentions that have been served on either all or

CCEZSAPM                        Motion

 1    virtually all of the defendants, contain allegations of '402

 2    and '502, all premised on BusinessObjects.

 3              THE COURT:  All right.

 4              MR. NATHAN:  Okay.  So, if I may?

 5              THE COURT:  Yes.

 6              MR. NATHAN:  So we have, to my knowledge, not accused

 7    any other product, besides BusinessObjects, in our contentions

 8    in Texas, which we understood coming here, as you know from the

 9    motion clarification, was the scope and breadth of this case,

10    which is to solve that problem, apparently, to solve that

11    problem for those customers in Texas.  So it was going -- it

12    was always about '502 and '402 as they relate to

13    BusinessObjects.

14              THE COURT:  So if, hypothetically, my ruling is that

15    as to '402, which was the limits of my ruling in June, it only

16    related to '402, and the lack of infringement contentions in

17    '402, right, isn't it?

18              MR. NATHAN:  Yes.

19              THE COURT:  That was the issue, infringement

20    contentions '402.  If I were to say that '402, the ruling, was

21    broader than that and you take '402 out, do you still have

22    claims against all of the customers that you sued under '502 or

23    only some?

24              MR. NATHAN:  We have claims, we have claims against

25    all of them.  And I guess, you know, the argument would be that

CCEZSAPM                    Motion

1    '402 -- as I say, '402 was only ever about BusinessObjects.

2            THE COURT:  Well I know that's your contention.  The

3    counterclaim may be a real more broader than that, but let's --

4    I just wanted to get clarification.  Mr. Reines, I'll let Mr.

5    Reines continue.

6            MR. REINES:  Thank you, your Honor.  So to start with,

7    in terms of an expert giving opinions about additional

8    infringement that may occur, there's nothing with respect to

9    SAP that I'm aware of that relates to that.  There may have

10   been something with respect to Microsoft.  I honestly don't

11   know.  And I just don't know what that's referring to.  There

12   is no -- the expert report in this case acknowledges that under

13   your Honor's construction, BusinessObjects just does not

14   infringe.  There is no attempt to say, you can modify it to

15   make it infringe or anything else.

16           THE COURT:  Well, okay.  Well, we'll wait till the

17   plaintiff -- DataTern will be able to respond to whether

18   that's --

19           MR. REINES:  I think as I go through, your Honor,

20   it'll help to clarify some of this.

21           So I mean, basically, the point of Kessler which

22   addressed your irreparable harm argument and other things, is

23   once you prevail as a manufacturer that your product doesn't

24   infringe, you have very substantial rights for enjoining that

25   isn't the business of the sister courts.  I mean, in Kessler

CCEZSAPM                    Motion

 1    the same kind of analysis your Honor raised could have been

 2    raised, which is, well, why doesn't the sister courts just have

 3    the restraint to not let it happen or to welcome a res judicata

 4    argument or a collateral estoppel motion.

 5            Kessler is very clear that the fact of the prior

 6    judgment would be virtually destroyed.  It's protecting this

 7    Court's judgment, which is imminent, and it confers a trade

 8    right.  So it's sort of an additional right to have your

 9    product freely bought and sold.  This is an MGA, so this is the

10    Federal Circuit's description of what Kessler held, so it's

11    fresh and it's specific.

12            So the syllogism is pretty simple.  It's not a very

13    complicated model like maybe a transfer of MDL issue.  It's

14    just once you've prevailed on your judgment, you have a right

15    not to have your customers sued.  And in fact what Kessler

16    said, Kessler went even further.  It said, it may be that the

17    suit against the customers isn't res judicata, and it may be

18    that they could potentially win that case against the

19    customers.  It's what it says in Kessler.  But, nonetheless,

20    through the vindication that you got in the manufacturer's

21    suit, you have a right to enjoin suits and threats against

22    customers.  And again MGA refreshes that.  And I believe to me

23    the logic of Kessler, which is pretty much laid out right in

24    it, as the Court reviews it again, is inherent in your

25    customers being sued is irreparable harm.  Inherent in people

CCEZSAPM                    Motion

being discouraged from doing business with you, because they

may get sued, or in having to cost of defense, all of those

that were good will about your product, all of those things are

inherently irreparable harm that are difficult to quantify, and

we'll get into that further.

But let's talk about some of the equitable

considerations that the Court put the finger on.  You know,

what is the harm?  Well, your Honor, to be clear, I think the

balance of equities, to the extent we're going to adopt that

model and not just apply Kessler, favors sharply SAP on the

question of adequacy of money remedy.  DataTern is a non-

practicing entity, as the Court knows, and whether it gets

$50,000 today or it has to wait a few years to get $50,000 or

whatever the judgment is, is just compensable in money.  There

is not a problem there.  If we have to get in a dispute with a

customer with an indemnity argument where people are spending

lawyer time on it and paying the $50,000 -- let's just take

that case -- there is no getting that $50,000 back, your Honor.

If we go up and we demonstrate, you know, that we've absolutely

won this case and then we go to Texas and that kills the Texas

case --

THE COURT:  You get it back from DataTern.

MR. REINES:  The settlement money?

THE COURT:  Yeah, you'd sue them for it.

MR. REINES:  Under what theory?

1          THE COURT:  That would be you -- I'm not going to give

2     you legal advice.  But if you have prevailed and found them to

3     have, you know, engaged wrongfully in pursuing something, there

4     is no lawsuit you can think of to get that money back?

5          MR. REINES:  It would be --

6          THE COURT:  Unjust enrichment, you know, things like

7     that.

8          MR. REINES:  Yeah, it would be very difficult unless

9     we basically be a sanction.  It would be that the Texas -- to

10    get -- once there is a settlement, getting settlement money

11    returned, even if the patent's invalidated, if the patent's

12    invalidated after someone pays settlement money, you don't --

13    everyone doesn't get their settlement money back.

14         THE COURT:  No, I understand.  You wouldn't be

15    getting -- the customers would not be impacted.  You wouldn't

16    be getting the money back from the customers.  They wouldn't be

17    getting it back from DataTern if they paid and you paid.  Let's

18    say we got a customer in the middle.

19         MR. REINES:  Right.

20         THE COURT:  Customer comes to you says, I want

21    indemnification 50 grand, you pay it to them, they then pay it

22    to DataTern, turns out that DataTern was wrong to have ever

23    brought that lawsuit.

24         MR. REINES:  Meaning it was a Rule 11 violation?

25         THE COURT:  Rule 11, that --

1            MR. REINES:  I think it is under sanctions.  I don't

2      think -- I don't forswear for ever coming up with a legal

3      theory or being creative about it, but, unfortunately, I don't

4      think it's that easy to get settlement money back absent -- now

5      in this case, you're likely going to get exceptional case

6      motion seeking fees back.

7            THE COURT:  Well, let me just raise a possibility.

8            MR. REINES:  Yeah.

9            THE COURT:  Assume for the moment that DataTern

10     prevails on this Court to have a court believe that the cases

11     in Texas are not identical to the one --

12            MR. REINES:  Okay.

13            THE COURT:  -- and wouldn't be covered entirely by the

14     Markman ruling here; that there is a theory of infringement by

15     these customers utilizing claims that were not at issue in the

16     claims construction.

17            MR. REINES:  That's issue two.  Understood.

18            THE COURT:  Okay.  So, and then I don't enjoin --

19     let's just assume that I don't then enjoin those Texas actions.

20     It turns out later on that you're able to demonstrate in fact

21     the only thing that was really being litigated was on all fours

22     with me here in New York, but not through bad faith, just

23     through your ability to show that the kind of conduct that they

24     were claiming infringed claim X, happened to be captured by

25     claim Y.  There has got to be a theory that you can find to

1    then use to get that money back.

2                MR. REINES:  I am very glad I have this transcript

3    now, and we will look into that.  I think it's much easier to

4    look at the adequacy of money damages for DataTern, which is

5    whether that suit's in a year or two, it is well established

6    law that from malpracticing entities such as this, and there

7    certainly has been no showing of irreparable harm for them in

8    any kind of defraud of their case.

9                THE COURT:  Would you toll the statute of limitations?

10                MR. REINES:  Yeah, that's fine.

11                THE COURT:  Would the customers do you think toll the

12    statute -- you would toll the statute of limitations as to your

13    liability, what do they do about that?

14                MR. REINES:  If they stay that case, then it's, you

15    know, pending.

16                THE COURT:  Stayed.

17                MR. REINES:  Yeah, so it's tolled in that sense.

18                But we have, you know, we have, you know, answers

19    beyond that.  But I do think it would be unfortunately

20    difficult for us to be compensated for returns in settlement

21    dollars.  That's our belief.  Yes, their adequacy of money

22    damages is the other way, so the balance of the equities like I

23    says is sharply in favor of an injunction here for that

24    specific reason.

25                So this is the passage from Kessler, your Honor that I

CCEZSAPM                          Motion

foreshadow before, which is I think when they're saying it's
really hard to show damages and to get compensated for trying
to stop customer suits or to reverse what's happened in
customer suits after you've prevailed.  And I think that's why
there was -- in Kessler they just said you basically have a
right.  Kessler basically says you have a right to the
injunction.

        Now we do have to address the second issue, your
Honor.  I'm not running from that.  But as to whether there is
an injunction appropriate for accusations related to SAP out of
the box, I think that is just a simple application of Kessler
in a syllogistic two stepper.

        Okay.  So let's talk about the harm to DataTern in
addition to the adequate money damages.  In Massachusetts,
which isn't even about BusinessObjects, it's a different
product, DataTern argued for a stay in this case, stating that
continued litigation would be duplicative, wasteful and
burdensome.  And they even said it makes no practical sense to
proceed in this matter now that the New York court has issued
the Markman order.  That's in the case not involving any
product in front of your Honor.

        I think the reality, the real politic is, under your
Court's construction they don't have an infringement claim
essentially against anybody.  That's reality.  You know, could
I prove that to a conclusion now?  But that's the reality of

CCEZSAPM                    Motion

 1    the situation.  If you look at our summary judgment, all four

 2    defendant independent grounds, I mean there is not barely that

 3    many requirements of the claim, and those are all fundamental

 4    arguments.  They're not -- they wouldn't concede noninfrigement

 5    if they were at the margin, or they would come up doctrine of

 6    equivalence theories.  Under the court's construction, they

 7    don't have a claim against anyone.  Reality of the situation.

 8    So they told Massachusetts, where they thought the Court would

 9    be -- presumably follow this Court's claim construction order

10    or await it, let's not litigate this case any more, let's be

11    done with it.

12            Now, in Texas they wanted to proceed, and that's

13    because of these customer suits.  And, your Honor, it's --

14    we've laid it out.  The reality is that for our customers, you

15    know, 50,000, $100,000 is, in this day and age, not a whole lot

16    of litigation to incur.  So the fact of that case proceeding at

17    all creates a value of 50,000 to $100,000, that's probably an

18    80 percent or 90 percent discount on fees for the case.  So

19    even -- so the customers are all, you know, going to be tempted

20    to take a $50,000, $100,000 settlement now that that case is

21    open.  That's bad.  That's a bad thing.  It's not what the

22    system's going to want to promote.

23            Now what did they say in that stay in Texas, your

24    Honor?  What they said in the stay in Texas as to SAP, which is

25    the BusinessObjects product family, that's off the shelf.  And

CCEZSAPM                     Motion

1    we're going to go through some quotes, because it's

2    inconsistent with what's being said now.  That's --

3        THE COURT:  But if that's true, why didn't the Texas

4    court go ahead and you would have brought that to the Texas

5    court and said they lied to you, and then the Texas court would

6    say, hey, I'm going to now put these -- I'll put the stay back

7    in place.

8        MR. REINES:  I think it's the reason for the

9    irreparable harm and the urgency in all of this is that what

10   they're exploiting -- I mean, as I walk through the narrative a

11   little bit, I'll answer directly that.  So what they argued was

12   Microsoft is a set of software tools.  SAP is off the shelf.

13   That's sorts of what all this is going to prove.  And they said

14   to end confusion on defendant's behalf, we're just going

15   against Microsoft.  That's what it says.  This was their stay.

16   And, in fact, in an e-mail they said they'll agree they will

17   not pursue claims of infringement against SAP customers that

18   use BusinessObjects as a so-called off-the-shelf product.  See

19   they knowledge they say, okay, to the extent people using SAP

20   as off the shelf without changing the software code,

21   presumably, we're not -- we agree we shouldn't be pursuing

22   that.  And they told the Texas court that the cases could go

23   forward on the basis of claims other than those related to the

24   use of SAP's BusinessObjects.  That's a letter to your Honor.

25   So they're saying -- they told the Court in Texas, this case

CCEZSAPM                              Motion

can go forward against Microsoft -- you saw that in words one

syllable, then in characterizing what they did to you, this was

on the motion to expedite the briefing, they told your Honor

the case can go forward on claims other than those related to

the use of SAP's BusinessObjects.  Because the only theory in

reality in Texas is off the shelf use.  Now that off the shelf

is a little fuzzy, meaning the basic normal intended use of

BusinessObjects.  I think that's the best way to put it.  And

their going in position was Microsoft is a bigger dog, they're

more of a toolsy type of technology, we want to go after

Microsoft, keep that alive, go after their customers for the

50,000, $100,000 settlements and don't get the -- if SAP is

going to keep the stay in place, that's all bad for us.  So

SAP, let's just not pursue that.

         In one of the things that we've heard, which we're not

hearing now, but one of the things -- we're not really

harassing people.  We're not even pursuing them on the basis of

BusinessObjects.  Your Honor might remember that's the Haller

declaration, which is the linchpin.  They're basically saying

both things to your Honor at the same time.  The Haller

declaration is this detailed lawyer written, one of those

classic dodging issues they need to, where it says we're not

asking anybody for money for BusinessObjects.  It's all about

Microsoft.  Why are they saying that?  Because there is has

been a basic acknowledgement, we cited two examples

1    -- that they're not really going after SAP down there because

2    SAP isn't a tool that's making new software.  It's just a

3    product that people are using for its normal and intended use.

4    So they're going into this, and even as part of this injunction

5    proceedings was, well, it's really -- there is no big thing,

6    we're not really pursuing BusinessObjects.  And this Vermont

7    structural case, which is Second Circuit case, says it's a

8    little significance that someone insists they have no intent to

9    harass plaintiffs and its customers.  This is applying Kessler.

10   Under Kessler, you just get it, you just get that freedom of

11   your product once you've prevailed in a manufacturer's action.

12   That's how it works.  All right.

13           Now I think we've addressed why we deserve an

14   injunction for the normal intended use of BusinessObjects.

15   Kessler just permits it.  The balance of the equities heavily

16   favor us.  The cynical pattern of the settlements for fraction

17   of cost of defense is irreparable harm, but let's talk about

18   the issue that the Court emphasized, which is is it really the

19   same action, how do we deal with that.

20           In our request for relief, your Honor, we came to this

21   Court after all these customer actions were started.  And this

22   is a problem.  This is a practice with non-practicing entities

23   is where they sue mass defendants and they go to each one and

24   then they say, well, it will cost you 50,000 or $100,000 to

25   open the file, so just give us that and you'll be fine; you

```
1    don't own the technology so you can't defend it ably, you're a

2    company like Aetna Insurance so you don't have a patent

3    infringement team like SAP does.  And this is an example of

4    what they've done here.  We came to this Court in a pretty bold

5    effort to say, no, that's about our product and that kind of

6    conduct's not appropriate.  We sought relief from this Court in

7    our pleadings to prevent them from, directly or indirectly,

8    charging infringement of our -- against our customers based on

9    the '402 and '502 patent.

10            THE COURT:  So let's just pause for a second, because

11   now I'm back to the issue I had before, which is the '402 and

12   the '502 patent had more claims -- have more claims in them

13   than those which were asserted as infringing in this case, '502

14   and -- I mean because '402 as to SAP -- well, they have more

15   claims.

16            MR. REINES:  Yeah.

17            THE COURT:  The claim construction proceeding, which

18   has, according to DataTern, undermined their current situation

19   in the Southern District of New York --

20            MR. REINES:  Right.

21            THE COURT:  -- related only to terms at issue in the

22   particular claims that were being construed in the action

23   before the Southern District of New York.

24            MR. REINES:  Right.

25            THE COURT:  So that language would suggest that if
```

CCEZSAPM                          Motion

1    somebody infringed another claim not before this Court, that

2    utilized -- didn't use any of the same language, so it's not

3    affected by my Markman ruling, that they would be prevented

4    from bringing that claim.

5            MR. REINES:  Right.  So your Honor's identified a few

6    things that are outside the scope of what was litigated in

7    through our summary judgment motion, which is is it different

8    uses, modifications of BusinessObjects, BusinessObjects, non-

9    BusinessObjects, and claims in suit and non-claims in suit, at

10   least in terms of what's asserted by the defendant, right.

11   Those are three ways.

12           THE COURT:  I'm only thinking of claims in suit versus

13   non --

14           MR. REINES:  Right now.  But you had raised the other

15   two issues.  There is really three categories just for

16   intellectual purity.  And so Kessler would be an empty shell,

17   your Honor.  And this whole exercise of us coming and creating

18   yet another case in this dispute with DataTern, would be an

19   empty shell, if it could be a shell game, which is we come and

20   we say we want to be free from what you're doing to our

21   customers, and if they could just assert claim one, and then

22   say, well, claims two through ten or two through 40 aren't

23   affected by what this Court does, so we can still pursue

24   customers, you wouldn't have a manufacturer's suit doctrine,

25   you wouldn't have Kessler.

CCEZSAPM                         Motion

1          THE COURT:  Well, how about this?  I'm really like a

2    release almost the way you've got it written here, against SAP

3    I understand, or any of its customers, licensees, distributors

4    users or suppliers.  So let's just say SAP has IBM as a one of

5    the -- IBM falls into the category of a user or a supplier --

6          MR. REINES:  Right.

7          THE COURT:  -- of something.  That means that the --

8    but that means that DataTern could not technically with this

9    injunction language sue IBM completely unrelated to anything

10   having to do with SAP, but related to the '402 and the '502

11   patent.

12         MR. REINES:  Right.  And the answer to that, your

13   Honor, is as it relates to SAP customers, I think

14   reasonableness and reading this in the context of the

15   pleadings, that's for technology purchased from SAP, which,

16   essentially, for purposes of today's discussion is

17   BusinessObjects.  That's all we're seeking.

18         As to -- and this goes to the motion for

19   clarification.  As to SAP itself, it's any -- if they think

20   we're infringing those two patents, come forward now.  And with

21   respect to our customers, it can't be cat and mouse where they

22   can narrow their response to the manufacturer's broad DJ claim

23   and then preserve the ability to chase customers.  It would

24   just emasculate the manufacturer's right to bring a case, which

25   is so logical for the system, and prevent so much opportunity

CCEZSAPM                        Motion

for mischief, especially in this day and age, your Honor.  This
is a big problem in the community now.  Kessler probably had
some form of the problem and the Supreme Court spoke then.
There's a trade right that you have to work with your customers
that you're allowed to step in and clear up the issue with your
customers; can't be cat and mouse where they can say, well,
only claim one, three and five and seven against the
manufacturer so, therefore, we can still pursue two, four, six
and eight against the customer.  That makes no sense.

THE COURT:  Did you put in a proposed form of order?

MR. REINES:  What we did, your Honor, there wasn't a
requirement for that, but our thinking on that was we had
provided an injunction that we had asked for DataTern to enter
into, and we figured that really served that function or it
would have been duplicative.

So we understand, especially as it relates to
customers, I mean, the characteristic of being a customer is
customer of SAP.  That's at a minimum implicit, it's certainly
explicit in the document.  But yes, it's that broad.  If they
had claims against us or customers for purchasing the
BusinessObjects technology, they needed to make it in front of
your Honor.  That's why the other cases were stayed.

THE COURT:  Do one of your associates or colleagues
have the slides in printed form?

MR. REINES:  Unfortunately, your Honor, we were in the

1    black car on the way, which I normally take the subway, but we

2    needed to finish it up because we only got their briefing last

3    night.

4                THE COURT:  All right.

5                MR. REINES:  All right.  I apologize for that.

6                THE COURT:  That's okay.  I was going to ask him to

7    pull out this page.

8                MR. REINES:  But we can certainly provide this to

9    everybody.  That's not a problem.

10               So the real answer on is this case bigger, narrower or

11   broader or different or the same the customer suit is, by

12   necessity for the customer suit doctrine and the manufacturer's

13   trade right to have any logic, it has to have covered all of

14   that.  If they thought that our product infringed as used by

15   our customers, they were required to bring that issue here.

16   That's the long and short.

17               THE COURT:  Hold on.  Back up.  I just want to -- I'm

18   going to talk to you folks about -- almost done.  Okay.

19               MR. REINES:  All right, your Honor, and the

20   injunction, form of injunction we provided is the Reines

21   declaration Exhibit B for reference.

22               So this case is broad enough to encompass any

23   accusation based on BusinessObjects.

24               Now, they admitted in Texas, and it's hard to be more

25   point blank than this your Honor, they admit in the motion to

CCEZSAPM                    Motion

 1   stay in Texas that they would not be able to prove infringement

 2   based upon the use of SAP's BusinessObjects product.  So I find

 3   it troubling that the argument being made to your Honor,

 4   basically invited by your Honor's clarification about what the

 5   facts were, that they're now saying, well nobody's using the

 6   product as it was intended to be used.  That's the essentially

 7   the argument you're getting now, right.  And I mean that's what

 8   Mr. Nathan said.  He said, oh, none of those cases involve the

 9   ordinary use of BusinessObjects, they're all doing something

10   different.  That's how I understood --

11            THE COURT:  You'll have a chance to respond for sure,

12   so.

13            MR. REINES:  Yeah, that's how I understood it.

14   Whatever he said, it really doesn't matter because we have

15   admission after admission, but here's one that they basically

16   represented in Texas.  We can't prove infringement based on the

17   use of SAP's BusinessObjects based on the Court's claim

18   construction.  I don't mean to suggest it's not based on that,

19   and I think that everybody understands that's what I'm saying.

20   And if the court goes, these are submitted, these are exhibits

21   P. and Q.  So the original position they were taking is we

22   acknowledge that all we're accusing is the ordinary use of

23   BusinessObjects, and we acknowledge that we can't prove that

24   infringement.

25            Now, when I first raised this issue with DataTern's

CCEZSAPM                        Motion

1  counsel --

2              THE COURT:  So can I ask a question?

3              MR. REINES:  Sure.

4              THE COURT:  The motion to clarify the June order

5  actually doesn't even matter for you.

6              MR. REINES:  Doesn't matter.

7              THE COURT:  Because for your purposes it's okay that

8  the June order, even if it only related to BusinessObjects,

9  you're still okay.

10             MR. REINES:  Right.  The only thing about that is

11  dropping little into the motion for clarification is they

12  suggested that they want to sue SAP somehow -- I haven't done a

13  big expensive investigation -- for some relationship with

14  Microsoft products.  Microsoft products that are in front of

15  the Court, and it's sort of like, well, we brought this case to

16  be free from your infringement claims under these patents.  We

17  said as part of what we wanted, we wanted an order that SAP

18  wasn't infringing itself.  If you thought you had claims

19  against us based on our involvement with the Microsoft

20  technology, bring them in this case.  How could they possibly

21  hold and dangle a claim against SAP for its involvement in

22  Microsoft technology out of this set of cases in front of your

23  Honor with SAP and Microsoft and they can bring it against us

24  in a year and then offer to settle for $50,000?

25             Okay.  After we received this document, which our

1  team, crack team redacted, I sent an e-mail saying, we're

2  really troubled by this because our customers are now

3  attempting to settle for de minimis amounts because they just

4  don't want the expense of the stay going forward.  And the

5  response was DataTern's position in Texas exempted infringement

6  claims based on SAP's BusinessObjects, which was their

7  mentality because their mentality is let's keep the Texas case

8  alive and focus on the figurability of the Microsoft technology

9  which is, like I say, at least according to the argument of

10 DataTern, more of a tool set.  That's their, what they wrote

11 us, okay.  And our briefing has even more of this stuff, all

12 right.

13         So here's their Texas infringement contentions.  First

14 thing to note about the Texas infringement contentions, they

15 often characterize them as preliminary.  In Texas I think it's

16 like this court's, there is only one infringement contention.

17 Your Honor, I'm Chair of the Northern District of California

18 Patent Rules Committee.  The original Northern District

19 California rules, which we created in 2000, had a system of

20 preliminary infringement contentions, then claim construction

21 and discovery, more discovery, and then you have as of right,

22 basically, based on the claim construction or very generous as

23 of right.  And what happened is courts -- experience was like

24 that's not really working to crystalize sufficiently issues

25 early.  And they moved to, you have contention that you set

CCEZSAPM                    Motion

1    forth after reasonable amount of discovery, which is shortly

2    after -- it's actually rather early so that issues crystallize

3    for claim construction so people know what it is that's really

4    at issue for claim construction, and they're not resolving

5    hypothetical claims construction disputes.  And if you want to

6    change things after the claim construction order, you need good

7    cause.  And then there is a list of sort of what the rough,

8    relatively rough at times good cause standard is.  So these are

9    their contentions.  And what I note is every single element --

10   I'm sorry, your Honor for the size on this.

11         THE COURT:  No, it's my eyes are on that between

12   stage.

13         MR. REINES:  So every single element of the claims in

14   this infringement contentions rely on BusinessObjects, on the

15   implementation of BusinessObjects by the customer.  And here,

16   just to highlight, it says, there are likely to infringe based

17   on the methods necessarily employed through the utilization of

18   BusinessObjects; i.e., the ordinary use of BusinessObjects.  So

19   the off-the-cuff statements in the courtroom about what was

20   being alleged are very different from what the infringement

21   contentions are and are different from the position of DataTern

22   in the stay proceeding, and in trying to stave off this

23   injunction motion, that we're not really going after SAP

24   because we acknowledge we can't really win under the Court's

25   claim construction.

CCEZSAPM                        Motion

1              So what -- this is what we have in terms of the slide

2      deck.  When you boil it all off, your Honor, what happened here

3      is DataTern wanted to keep the Texas cases alive against

4      Microsoft for its settlement strategy, and the district court

5      in Texas, the magistrate judge in Texas, either wasn't alerted

6      or whatever -- we're not parties, I think that's maybe, you

7      know part of it is we're not a party which is why

8      manufacturer's action is preferred -- but they opened the case

9      up against both SAP and Microsoft, inconsistent with at least

10     many of the arguments of DataTern, and it was sort of a gotcha.

11     They said, well, you know what are we -- read the letters that

12     their attorney sent to your Honor again.  What are we supposed

13     to do?  Now it's opened up, we can't do anything about it.  So

14     we will have to live with SAP cases being reopened in Texas

15     because the Texas court didn't get the suttly that the real

16     basis was the Microsoft case, not the SAP case.  And so they

17     quickly went to the dozen or so of our customers, maybe they

18     did, maybe they didn't, they're claiming they never used the

19     word BusinessObjects in those discussions, but there's some

20     people who are only sued on BusinessObjects, not Microsoft

21     customer.  And I can report to you that the one that I'm about

22     to hand up, your Honor, is one such customer, and -- but the

23     response -- this is why it's the Holler declarations is so

24     valuable.  Because their response doesn't say well, of course,

25     we can settle with them, they're all modifying BusinessObjects

1    in totally different ways that move them -- that cure the four

2    problems we have under the Court's claim construction, you

3    know, that was what would have to happen.  They'd have to be

4    changing so the object model means this and that on four

5    independent grounds, so we're entitled to pursue them in Texas.

6    That's why we're entitled to no stay, and we're entitled to get

7    settlements from them.  That's not what it says.  What it says

8    is we never mentioned the word BusinessObjects.  Essentially,

9    what they're arguing about the injunction motion is we're not

10   really doing what they're alleging we're doing.  There is no

11   reason for this proceeding, expedited or otherwise, because

12   we're not attempting to capitalize on the reopening of the SAP

13   case for settlement gain.  That's their position.  But so

14   they're taking two positions that are inconsistent.  Because

15   what you're hearing now is, wait, everything in Texas is fair

16   game, because we allege that that's all not the normal use of

17   the product.  And somehow -- because the Court looked at the

18   normal use of the product.  I mean, your Honor, the claim

19   construction and the infringement, that thick expert report,

20   all is how BusinessObjects would normally be used.  And if they

21   had any infringement theory under how our product would

22   normally be used, they set it forth.  You don't think -- I mean

23   they're obviously attempting to do that.  So what they're

24   essentially arguing is, well, in Texas there's non-normal uses

25   or there's changes to the code, which they will never be able

1    to show.  They've given you know evidence of that.  If they had

2    it, they should have brought it forward in this case based on

3    the breadth of our claim.  And their conduct is completely

4    inconsistent with it, which is no we have no claim in Texas

5    based on BusinessObjects, under the Court's claim construction,

6    and we were not seeking settlement for BusinessObjects, which

7    is really the heart of their argument, which is the opposite of

8    the argument that the Court's worried about.

9            THE COURT:  So what do you do with an injunction that

10   is defined in terms of BusinessObjects, which they then don't

11   feel bound by; you just move for contempt?

12           MR. REINES:  Oh -- yeah, no, I think they'll honor

13   your Honor's injunction.  It's so well established.  I mean,

14   it's right out of Kessler.  If you --

15           THE COURT:  I mean, if they say -- if there were an

16   injunction that issued that said -- and it could be a sleeves

17   off the vest, if what they're saying -- and I'll let people

18   to -- Mr. Nathan, you and Mr. Caruso, I'll let you folks tell

19   me what the correct articulation of your arguments are.  I

20   don't mean to put words in your mouth apart from what's in the

21   papers.  But if it's the case that there could be no lawsuit

22   brought against SAP or its customers relating to technology at

23   issue in the lawsuit here before this court in Southern

24   District, an injunction issued to that effect, then if what

25   they're saying is correct, then it should be sleeves off the

CCEZSAPM                    Motion

```
 1   vest because that -- stipulating to that kind of injunction
 2   shouldn't actually inhibit them because if it's really true
 3   that they're not going beyond -- they're only going beyond this
 4   Court's order, then issuing something that limits them with
 5   respect to this Court's order shouldn't trouble them.
 6           MR. REINES:  Right, but --
 7           THE COURT:  But I'll ask Mr. Nathan and Mr. Caruso
 8   about that.
 9           MR. REINES:  That's mostly true, because they're
10   essentially saying -- half the time they're saying we're not
11   pursuing BusinessObjects in Texas under the Court's claim
12   construction, your Honor, because we can't satisfy that.  And
13   so in that sense being told not to do that doesn't really cost
14   them anything.
15           There is two problems that are at the heart of why
16   we're bringing this motion.  One is the ambiguity about whether
17   they can throw elbows for a little while in Texas about whether
18   they're doing the exact same thing or not incurs enough
19   attorneys fees that people are going to settle for the amounts
20   that --
21           THE COURT:  But now how do I -- I can't enjoin even
22   under Kessler, more than I had before me to begin with.
23           MR. REINES:  Right.
24           THE COURT:  So if they claim they've got a lawsuit
25   that's separate and apart from what I had before me, I can't
```

CCEZSAPM                    Motion

stop that lawsuit.  I mean, I suppose I could --

MR. REINES:  Nobody's asking you to stop any lawsuit.
What you're doing is your enjoining DataTern, that's what
you're doing.

THE COURT:  Understood.

MR. REINES:  And in that case, it's what's in front of
your Honor.  What was in front of your Honor is, they're suing
our customers regarding their use of BusinessObjects.  We're
coming to this courthouse to free them from that claim because
rather than having, I mean hundreds and hundreds of customers
sued one by one with $50,000 settlements from all with no
access to the technology, no patent litigation department, we
should do that here -- this Court, your predecessor and your
Honor said yes that makes sense, Texas already said that made
sense because it stayed the case originally.  And so in front
of this Court should have been any claim about our
communication of BusinessObjects and their use of
BusinessObjects being an infringement.

THE COURT:  Well, that's sort of like a res judicata
claim estoppel kind of issue.  It's a --

MR. REINES:  It has an element, but what's the trick
to getting this is that in Kessler the Court said it may not be
res judicata.  But since there is a manufacturer's action and
you proved that your product didn't infringe, and they didn't
come forward with showing that your customers' uses infringed,

CCEZSAPM                        Motion

1    there is no claim.  This is different than Katz.

2            THE COURT:  No, the nub of it, though, is exactly that

3    last phrase, which is they proved that your customers' uses

4    don't infringe.  And the question is whether or not it meets on

5    all fours.  You say they do.  Their papers at least have said

6    they don't; that the actions are broader in Texas than here.

7    So one of the things to think about is whether or not do we

8    need to have experts come in on, you know, Tuesday to say the

9    same, they're different.

10           MR. REINES:  I feel -- I'm not being clear enough on

11   this.  What we came here and said, we sell BusinessObjects.  We

12   don't believe it infringes.  Our customers' use of

13   BusinessObjects doesn't infringe.  We want a vindication that

14   you can't threaten our customers for infringement for using

15   BusinessObjects.  If the burden was on them because they're --

16   they have the claim either under theories of compulsory

17   counterclaim or however you want to look at it, to come forward

18   in this Court and say wait a minute, Judge Forrest, don't enter

19   that judgment, that gives these people the declaratory judgment

20   that they want, they want a declaratory judgment that their

21   customers' use of BusinessObjects is infringing.  That's what

22   we want.  Everyone knows that's what we want.  It was incumbent

23   upon them if they really -- none of this is true.  They don't

24   really believe it.  But if they really believed that there were

25   adaptations made to BusinessObjects in four different areas

1    that got outside this Court's claim construction, it was

2    incumbent upon then to submit that proof in this case, and they

3    failed to do that.  So they're barred by the judgment in this

4    case from proceeding against our customers.  And the

5    limitation, your Honor, that I think brings the logic of our

6    position together is our customers related to their use of

7    BusinessObjects.  And if your Honor enjoins them from suing a

8    or pursuing or threatening our customers for their involvement

9    with BusinessObjects, then they can't do what -- you know, they

10   can't proceed against our customers based on the use of

11   BusinessObjects.  So they couldn't have -- this cat and mouse,

12   they can't preserve part of their claim against our customers

13   so they can go against them anyway even though there is a

14   manufacturer's action.  There would have been no problem in

15   front of this Court with the full luxury of the Federal Rules

16   of Civil Procedures liberal discovery to have said no, wait,

17   people are using your BusinessObjects to infringe; you're

18   selling it to them and then they're modifying it.  They're

19   making business -- they're adding run time engine, they're

20   changing the object model, and all the reasons why it doesn't

21   infringe.  So it is part of this Court's case.  That's the

22   fundamental point.

23          So what they're exploiting now was the

24   misunderstanding of the Texas court that they let that case

25   against SAP open up, even though DataTern, essentially, hadn't

CCEZSAPM                    Motion

```
 1    asked for it and say, well, what are we going to do?  Comity to
 2    that court for what it did.  And, yes, is it possible there
 3    could be reconsideration motions to the magistrate judge that
 4    could then be objections up to the district judge in Texas to
 5    clear all this up?  Yeah.  But before all that happens, people
 6    are settling, fact.  That's irreparable harm.  And it's this
 7    Court's responsibility, your Honor, I say politely, to support
 8    your judgment.  Because we came to your Honor to seek a
 9    declaration that we earned and got and spent seven figure
10    dollars to get to.  That's the relief we sought.  That's the
11    only thing that makes sense.  That's what Kessler tells us
12    we're entitled to.
13         The last thing I'd like to do, your Honor, is hand up
14    the document provided to counsel.  I hope it won't be misused
15    because it's --
16              THE COURT:  Have you managed to redact it?
17              MR. REINES:  The crack team was --
18              MR. GOETTLE:  I can't vouch for the esthetic
19    appearance, but --
20              THE COURT:  What did you do it with?
21              MR. GOETTLE:  The whiteout that Mr. Pecorino was kind
22    enough --
23              THE COURT:  Oh, Joe.  Okay I ways going to say if you
24    brought it --
25              MR. GOETTLE:  No.
```

1           THE COURT:  I waiting -- he gets the A.  Okay.

2           MR. GOETTLE:  And along with the pro se office down on

3   the 2nd floor we're kind enough to let us run off copies.

4           THE COURT:  All right.

5           MR. REINES:  Your Honor, just one thing.  If we could

6   do as attorneys eyes only, just because people are going to be

7   negotiating and it's a very awkward --

8           THE COURT:  Is that acceptable, Mr. Caruso?

9           MR. NATHAN:  Yes.

10          MR. REINES:  All right, your Honor, may I approach?

11          THE COURT:  Yes.

12          MR. REINES:  Thank you.  What I'm providing the

13  Court -- you wanted me to put it on the record.

14          THE COURT:  Yes.

15          MR. REINES:  Is a redacted e-mail pursuant to the

16  Court's direction dated Thursday, November 29th, with the time

17  it's partially obscured, but it looks like 2:29 p.m. and the re

18  line is DataTern update.  All right.

19          THE COURT:  All right, we'll mark this as court

20  Exhibit 1, it'll be filed under seal.

21          I'll mark it filed under seal.  Is that November 29th,

22  2012, is that what you said?

23          MR. REINES:  Yes.  That's what it says, your Honor.

24          THE COURT:  I'm going to just mark the date in pen.

25  All right.  The Court's reviewed that.

CCEZSAPM                    Motion

1          MR. REINES:  And, your Honor, I don't know -- I'm done

2     with the presentation on this.  I hope to have answered your

3     questions.  If you have remaining questions or want to cover

4     any of the other motions --

5          THE COURT:  Well, I'll do that later.  I do want to

6     hear from Mr. Nathan and/or Caruso on this.  So I think -- and

7     there will be a number of things I know you'll want to respond

8     to.

9          The issue that is most prominent in my mind right now

10    is, are the allegations or the statements made in your

11    papers -- and you're Mr --

12         MR. NATHAN:  Nathan.

13         THE COURT:  Nathan, right.

14         MR. NATHAN:  Yes.

15         THE COURT:  I want to make sure I've got it right.

16    That your assertion that somehow the lawsuits in Texas are

17    broader than what was before this Court, and that, therefore,

18    they should be allowed to proceed, or do I have that wrong?

19    And that really goes into this discussion of whether or not

20    it's all about BusinessObjects, and, therefore, it can -- it

21    can't or it should have fallen within what was before this

22    Court that we were just discussing with Mr. Reines.  Because if

23    it is what was before this Court, then I think an injunction

24    would be appropriate, and perhaps you would even agree.  And if

25    it relates to what was before this Court -- it does not relate

CCEZSAPM                    Motion

1   to what was before this court, to be very clear, if it does not

2   relate to what was before this court, then your agreement to an

3   injunction to not pursue claims as to anything that was before

4   this Court should be sleeves off the vest; it shouldn't bother

5   you in the least because you wouldn't do that which you

6   couldn't do.

7           MR. NATHAN:  I guess the best way to put it is that it

8   is our understanding, with very limited discovery,

9   notwithstanding some of the aspersions that have been cast

10  about that process, that one or more of the Texas customers

11  are, in conjunction with products that they -- with

12  BusinessObjects, are creating for themselves infringing

13  products, applications that they use.

14          THE COURT:  So you have a derivative infringement

15  claim against these people?

16          MR. NATHAN:  To be honest, I haven't seen the

17  discovery.  I don't know what's going on, but --

18          THE COURT:  What did you allege?  Did you allege a

19  derivative infringement claim?

20          MR. NATHAN:  No.  There were -- the claims were very

21  broad and it was, I believe --

22          THE COURT:  So the --

23          MR. NATHAN:  I believe they're all direct infringement

24  claims at the moment.

25          THE COURT:  Okay.  Because here would be the issue.

CCEZSAPM                    Motion

1    Let's assume for the moment that before this Court was

2    BusinessObjects and that -- which it was -- and that according

3    to the Markman ruling issued in August, you have said that you

4    can't make out infringement as to SAP with respect to

5    BusinessObjects, then that would suggest that any customer of

6    SAP that's utilizing BusinessObjects and making a derivative

7    product thereof would be protected.  Because there would be no

8    infringement as to the underlying BusinessObjects from which

9    the derivative claim is then -- on which the derivative claim

10   is then based.

11        If, however, the customer is using only

12   BusinessObjects, that would be clearly covered by my Markman

13   ruling, and your -- combined with your admissions, not my

14   Markman ruling alone, but combined with your admissions as to

15   no infringement, how do you walk that tight rope?

16        MR. NATHAN:  What we offered before we ever came here

17   was, essentially, your second example; we will agree that,

18   until such time as there is an alternative construction of some

19   of the pivotal claim terms, to the extent that anyone is using

20   SAP's BusinessObjects, like they would use Quick Books, where

21   they would use Word, to simply use it out of the box without

22   more, we agree that once there is -- whenever there may be a

23   final judgment, in this case, which as near as I can tell has

24   not yet occurred.

25        THE COURT:  Might later on today.

CCEZSAPM                    Motion

1          MR. NATHAN:  There is no foundation on -- the only

2     foundation on which to enter an injunction is for that

3     straight, what I euphemistically call off the shelf or out of

4     the box use.

5          THE COURT:  But --

6          MR. NATHAN:  In Texas -- if I can just say one other

7     thing.

8          THE COURT:  Okay.

9          MR. NATHAN:  In Texas, my understanding of the rules

10    in Texas is that you start out with a Rule 3-1 and 3-2

11    disclosure, which includes what they call down there initial

12    infringement contentions.  And then you go through a period of

13    discovery.  And my understanding is also that you then get to

14    amend those contentions.

15          One of the orders that were not included in SAP's

16    papers was the proposed scheduling order, which ends with a

17    Markman hearing in March of 2013 and includes discovery

18    between -- now I'm pretty sure -- between now and March, and

19    perhaps afterward, at least some expert discovery afterwards.

20    So it is entirely conceivable that in the course of hearing

21    these issues, this customer suit exception not once but four

22    times in the past 12 months, that the Court finally

23    determined -- and I think just as an aside, that the magistrate

24    judge down there who has had this would be interested to hear

25    that she has considered less than all of the issues or may be

CCEZSAPM                         Motion

1    confused.  Because everything that you see here, she had, and

2    decided that not only would the claims related to Microsoft go

3    forward -- to your point earlier -- all claims without regard

4    to product, with regard to manufacture, get to a Markman in

5    March

6              THE COURT:  Now, let's pause in for one moment.  Two

7    points on that point first, then I want to circle back to the

8    concession that you said you were had been willing to make.

9              As to the magistrate's ruling to allow everything to

10   go forward, to the extent that the magistrate tread upon

11   Kessler, it would be error, frankly -- one hates to say that

12   and I, you know -- you know, again there is this point that as

13   to whether or not -- which I'm still listening to -- as to

14   whether or not your lawsuits in Texas really tread on all four

15   with our -- with the lawsuit here.  Because if the answer is

16   yes, at least some do, then to the extent that the magistrate

17   judge allowed those to go forward in the face of the Supreme

18   Court decision saying they shouldn't, it would have been error.

19             MR. NATHAN:  Except that in August, September, October

20   and November of 2012, there is no judgment of infringement.

21   There is a claim construction, about which there is no issue

22   preclusion.  It's not -- it's an interlocutory determination.

23             THE COURT:  Is that all that stood between -- is that

24   all that stands between SAP and getting the Kessler-type

25   injunction is a final judgment from this Court?  Because I'll

CCEZSAPM                    Motion

1    issue it right now, if that's all that stands between it.

2    Because you've conceded that there can't be any infringement.

3    I have those as party admissions before me.  There is an

4    undisputed issue of fact.  There is no disputed issue of fact

5    on that.

6              MR. NATHAN:  Depending on the scope, I -- perhaps.

7              THE COURT:  Well, we'll do that today.

8              MR. NATHAN:  But let's --

9              THE COURT:  At the end.

10             MR. NATHAN:  Let's also go to what part of what

11   Kessler was about.

12             THE COURT:  But is that all that stood between -- was

13   that the part of the basis upon which --

14             MR. NATHAN:  No.

15             THE COURT:  -- you argued to the Texas court, was that

16   my order was interlocutory?

17             MR. NATHAN:  No.  They don't satisfy the customer suit

18   exception.  They just don't.  There is not enough overlap.

19   It's -- not we're not merely -- the Texas defendants are not

20   merely resellers, and they offered no evidence to the contrary,

21   not one.

22             THE COURT:  Okay, so then going back to -- this was

23   the second point I wanted to circle back to, which is that you

24   had stated you would agree until such time -- you had at one

25   point said you would agree, that until such time as an

CCEZSAPM                        Motion

1   alternative construction to this Court's Markman ruling exists,

2   if ever, that to the extent that anyone is using SAP's

3   BusinessObjects, BusinessObjects out of the box without more,

4   you would agree not to pursue them.

5             MR. NATHAN:  Correct.  And we said so.

6             THE COURT:  And would you still be agreeing to that?

7             MR. NATHAN:  Yes.

8             THE COURT:  Okay.  So you can agree to that right now?

9             MR. NATHAN:  Okay.

10            THE COURT:  So that part's done.  Okay.  So the part

11  relating to anyone using SAP's BusinessObjects out of the box

12  without more, you've consented to not pursue those customers.

13            MR. NATHAN:  Correct.

14            THE COURT:  Okay.  So what we'll do is, we'll do a

15  consented to injunction --

16            MR. NATHAN:  But --

17            THE COURT:  -- for that, for out of the box SAP

18  BusinessObjects.

19            MR. NATHAN:  Out of the box, correct.

20            THE COURT:  Out of the box, okay.  I just want to --

21  we'll take it in pieces, okay.

22            Now, how about the none out of the box stuff?  So that

23  means, these are the customers that you've referred to in your

24  papers which you say are changing things.  You used a

25  particular word, and I don't want to put words in your mouth.

CCEZSAPM                        Motion

1          MR. NATHAN:  We can't agree about what we don't yet

2     know.

3          THE COURT:  But --

4          MR. NATHAN:  The information that we have suggests

5     that there is additional software development going on by one

6     or more of these customers which may integrate with

7     BusinessObjects.

8          THE COURT:  But if you can't pursue against

9     BusinessObjects --

10          MR. NATHAN:  But.

11          THE COURT:  -- then you can't pursue a derivative

12     claim which is based upon the infringement of BusinessObjects,

13     as a matter of law.

14          MR. NATHAN:  But we don't yet know whether it's a

15     derivative claim and -- we don't, and we haven't finished the

16     discovery yet, so.

17          THE COURT:  I know, but you can't start a claim based

18     upon BusinessObjects, period.  If the only claim --

19          MR. NATHAN:  Out of the box right, so, but --

20          THE COURT:  Well, every --

21          MR. NATHAN:  That's the --

22          THE COURT:  Until you've done discovery, every single

23     thing is out of the box, then you do discovery and figure out

24     if they're doing more.  But you start with building block A,

25     which is they're an ASAP customer, they've got BusinessObjects.

Then you say, and are they fiddling with it?  But you start off

with A and you just consented that you're not going to do A.  A

is off the table.

        MR. NATHAN:  We consented last -- two weeks ago to not

do A.

        THE COURT:  Okay.  I'll pull it in an order.

        MR. NATHAN:  So, but the issue is having the

opportunity because we're not there.  And because the district

court in Texas said we can have the opportunity to pursue other

claims that may relate to BusinessObjects but could also

involve internal software development that has something to do

with BusinessObjects, I can't stand here and tell you I know

what that is, because we don't yet know what that is.  But we

ought to have the opportunity, as the district court on the

fourth go around said we could have, to pursue those issues.

        THE COURT:  Why --

        MR. NATHAN:  And they're not just -- I mean, I need to

go back to the fact they're not merely -- these are not merely

resellers, which is a quintessential element to the customer

suit exception.  They're not.  This is not -- if all they were

ever doing was taking their product and selling it to you,

Kessler might apply, and the customer suit exceptions cases

might apply.  We have no claim in any case in Texas where one

of the Texas defendants is simply taking the product from SAP

and selling it to you, and --

CCEZSAPM                        Motion

1           THE COURT:  But --

2           MR. NATHAN:  -- the language that we quote on page 23

3    of the brief from Kessler is completely missing here, which to

4    me it ought to be enough without more to deny the request.

5           THE COURT:  Well, let me ask you, though, because what

6    I'm hung up on, Mr. Nathan, is -- I'm hung up on this point

7    that you've conceded that you don't have a claim of

8    infringement right now because -- against SAP, because of this

9    Court's ruling on the Markman hearing.  And you may one day,

10   that may be overturned by the Federal Circuit and this may all

11   come alive again, but we're just talking about where we are

12   today.

13           How can you base any claim on BusinessObjects, at all,

14   given that foundational premise?  You'd have to essentially X

15   out or erase the BusinessObjects portion of what the customer

16   is doing and say that their other activities are separately

17   infringing something else, patent 123.  That claim you could

18   bring.  But you can't bring a claim of indirect infringement if

19   that requires against what you've -- or direct infringement

20   against these customers if BusinessObjects is providing any

21   part of the foundational stone, unless there is a separate

22   patent that you're suing on, then you could certainly bring it.

23   In other words, you're without a '402 claim.

24           MR. NATHAN:  Well, '402 and '502.

25           THE COURT:  '402 and '502.  I apologize.

CCEZSAPM                         Motion

1          MR. NATHAN:  Okay.  There are two parts to this.  The

2     first is the extent to which we have an opportunity in Texas to

3     prove or not that some interfacing that any of those customers

4     in Texas are doing with BusinessObjects.  So they're building

5     application 123, they need to tie it into some part of the

6     BusinessObjects platform that's relevant to the work they're

7     doing, it separately infringes '502.

8          THE COURT:  It's a separate derivative claim.

9          MR. NATHAN:  It's a stand alone application, but it

10    needs to tie into BusinessObjects, so that's --

11         THE COURT:  It's a derivative claim.

12         MR. NATHAN:  It certainly could be a derivative claim,

13    but it could also be an independent claim and the problem is we

14    don't know that.

15         THE COURT:  If it's an independent claim, it's only an

16    independent claim as to another patent.  If it is based on the

17    '402 patent then it's definitionally a derivative claim.  Am I

18    missing something?  Isn't it a derivative claim?

19         MR. REINES:  Your Honor, in terms of derivative, I

20    mean in colloquial terms you would use the term derivative.

21    That's not a type of infringement, so it's not indirect or

22    direct.  I think the argument is it's a direct infringement,

23    but they're taking our product and adapting it.

24         THE COURT:  No, I know, but that --

25         MR. REINES:  There is not a concept of derivative.

CCEZSAPM                    Motion

1              THE COURT:  You're saying in patent law there is no

2      concept of a derivative claim?  Because there certainly is in

3      copyright law.

4              MR. REINES:  Right.  No, right.  There is no -- that's

5      right.

6              THE COURT:  There is --

7              MR. REINES:  That's right.

8              MR. NATHAN:  I'm sorry, I didn't understand where that

9      was going.  The essence of this is the same.  We believe that

10     they are creating something that infringes the '502, and

11     they're doing it in part because they have spent whatever

12     amount of money buying SAP's BusinessObjects, and they want

13     them to come together.

14             THE COURT:  Okay.  Can I have you pause for a second.

15             MR. NATHAN:  Yes.

16             THE COURT:  Mr. Reines, can you tell me why that

17     doesn't matter?

18             MR. REINES:  Okay, why that doesn't matter, your

19     Honor, is let me just go back to the out of the box point.  I

20     think the best -- the more -- less colloquial language which

21     really captures the issue is the normal use of BusinessObjects

22     is something they shouldn't be permitted to pursue.  Normal

23     ordinary, but some language like that.  Because in this case --

24     don't we put it on the screen real quick because this will

25     focus the discussion and save us all time -- this is from their

CCEZSAPM                    Motion

infringement allegation, okay.  This is nine.  Their

infringement allegation before your Honor was, SAP's customers

and users of the software products use such accused products to

develop object oriented applications that interface with

relational data bases.  Such accused products include

BusinessObjects.  So part of their suit was you have your

customers, you use your product in the normal way and that's an

infringement.  Then their expert report, we just pulled up and

that's in the record in the summary judgment proceedings --

what's the page number just we have it for the record?

           MR. PERITO:  It's paragraph 536.

           MR. REINES:  Talk about all of what Mr. Nathan just

said, your Honor, about how customers, licensees or otherwise

distribute the accused instrumentalities to third-party users

as part of such products.  And then they do all of these

building applications and all of what was just argued now.

           So the normal use of BusinessObjects is definitely

]what was at issue here.  So the argument that's actually being

made, especially if you go back to the papers, not so much its

evolution now, but consistent with now, is additional discovery

in Texas has the potential to reveal non-standard uses of the

product, non-normal uses.  I would consider it, you know,

changes to what the product is.  And I could talk about why

that doesn't make sense, because they don't have any evidence

of it, because there is no showing, because it's improbable

1    with four different problems that they never --

2                MR. NATHAN:  But all that's in Texas.

3                THE COURT:  I just want to get the initial response.

4    So let me just put it in my words so that I can be sure that

5    I've got your response, Mr. Reines.  Your response is that the

6    ordinary and customary uses, in your view, are what DataTern is

7    talking about, essentially, when it's discussing the possible

8    interfacing and/or change of BusinessObjects in order to work

9    with the customer's environment.

10               MR. REINES:  Yes, your Honor.

11               THE COURT:  All right, okay.  I understand.

12               MR. NATHAN:  There is no -- at least as far as this

13   motion goes, there is no evidence of that, right.  So there is

14   no -- and I suppose you'll end up going through the summary

15   judgment papers to figure out what, whether the scope of that

16   might be true.  But it strikes me that the bottom line for this

17   is that that's part of what's being -- what can and should be

18   litigated in Texas, which is the extent to which they are --

19   I'm going back to the point Mr. Reines made a few minutes

20   ago --

21               THE COURT:  Well --

22               MR. NATHAN:  Right.

23               THE COURT:  -- the point for me would be only that if

24   I issued an injunction that was consistent with what I had

25   ruled on the Markman, and you folks have conceded as a result

CCEZSAPM                    Motion

1    of the Markman which was you don't have an infringement claim

2    with respect to '402 and '502, and I incorporate within that

3    the ordinary and customary uses, you guys then fight out, I

4    don't fight out, whether or not those customer actions in Texas

5    are within that box or outside of that box.  That would not be

6    something which this Court would -- unless you brought a

7    contempt motion to the Court, which case the Court would then

8    have to have evidence on whether it was in on or out of the

9    box.

10          MR. REINES:  Your Honor, that's the crux of the issue

11    is, there will be no evidence in discovery in Texas that

12    customers are changing the product in this fundamental way.

13          THE COURT:  Well --

14          MR. REINES:  I'm just asserting that, okay.  That's a

15    mere assertion.

16          The result is they're all going to settle or be

17    threatened to settle, feel vulnerability to settle in the

18    interim.  Kessler says you don't engage in a claim preclusion

19    analysis.

20          THE COURT:  No, I understand.  What I'm saying is if I

21    entered an injunction pursuant to Kessler --

22          MR. REINES:  Right.

23          THE COURT:  -- and it says what it says, you may, Mr.

24    Reines, still have to have a discussion with DataTern as to

25    whether or not these actions are within or outside of the box

1    of the injunction.

2                MR. REINES:  But --

3                THE COURT:  That I cannot control.

4                MR. REINES:  Right.  And I think you very much can

5    control it, and that's where all the problem is, is in that

6    gray area that's attempting to be --

7                THE COURT:  But the language that you offered for the

8    scope of the injunction that you wanted -- let me just read it.

9                MR. REINES:  Sure.

10               THE COURT:  Enjoining DataTern and all attorneys or

11   other persons in active concert or partnership with DataTern

12   from directly or indirectly charging infringement or

13   instituting any further action for infringement of the '402

14   patent or the '502 patent against SAP or any of its customers,

15   licensees, distributors, users or suppliers for technology

16   purchased from SAP.  And then it should say, in the ordinary

17   and customary use of those products.

18               MR. REINES:  And, your Honor, I am saying that that's

19   not what we're seeking.  We're seeking something broader than

20   that.

21               THE COURT:  That was what you put on the board.  And I

22   just actually added more to it.  What are you -- that was what

23   you had on the screen.  Go back to your little screen.

24               MR. REINES:  The --

25               THE COURT:  Who has the screen that had the injunction

CCEZSAPM                    Motion

1   on it?  I just want to be sure I understand exactly --

2              MR. REINES:  The request for relief.

3              THE COURT:  The request -- that's the injunction.

4   That's called an injunction.  That was your request for relief.

5              MR. REINES:  Yeah, that's -- I'm just telling my

6   colleague what it is.

7              THE COURT:  It was like slide three or something.

8   Where you had the enjoining, the word that started enjoining.

9              MR. PERITO:  Right.  Sorry, your Honor.

10             THE COURT:  Stop.  That it's, that's it.

11             MR. REINES:  Okay.

12             THE COURT:  Exactly what I said, only I added in, in

13  the ordinary and customary uses of those products.

14             MR. REINES:  Right.  And that -- we don't want that

15  limitation.  My -- your Honor, the point that I'm making --

16             THE COURT:  You don't want which limitation?

17             MR. REINES:  The limitation that the Court proposed.

18             THE COURT:  The ordinary and customary uses.

19             MR. REINES:  Right.

20             THE COURT:  But you said that that's all these people

21  are doing is engaging in ordinary and customary uses of the

22  product.

23             MR. REINES:  Right.

24             THE COURT:  Yes.

25             MR. REINES:  So how I harmonize all that is clearly to

CCEZSAPM                    Motion

 1  the extent that we have the ordinary use of our product that
 2  was at issue here and that clearly should be enjoined.  Beyond
 3  that there is no -- and this was the subject of my
 4  presentation, your Honor -- if they had believed that our
 5  customers were using BusinessObjects, because this is the
 6  relief we sought, in ways that were non-normal, that infringed
 7  our technology, non-normally to infringe, they were obligated
 8  before this Court to come forward with it.  Because otherwise
 9  you get the situation like you have here of cat and mouse.  It
10  would be just like saying we're not asserting claim five.  And
11  so the first thing is, this was the relief we sought in this
12  case, they were obligated to come forward with it.  They've
13  made no presentation to your Honor that there this is any such
14  infringement beyond that.  It's just speculative.  And Kessler
15  doesn't engage in a strict argument of what was actually
16  decided in the case and some kind of claim preclusion argument.
17  In Kessler they say, once the manufacturer brings the issue to
18  free their customers based on their use of the product,
19  regardless of whether theoretically to proceed when in the
20  other cases, regardless of whether it would win.
21          THE COURT:  Let me put it more simply.  Your view is
22  that SAP, when it was suing in this Court, brought a lawsuit of
23  noninfringement as to '402 and '502 relating to all uses of
24  those patents.
25          MR. REINES:  By its customers.

CCEZSAPM                    Motion

1          THE COURT:  By itself --

2          MR. REINES:  Right.

3          THE COURT:  -- and its customers.

4          MR. REINES:  Yes, yes.

5          THE COURT:  All uses.

6          MR. REINES:  Right.

7          THE COURT:  So this whole business of customary --

8     we're on a detour and frolic here with customary and ordinary.

9     All uses is the phrase that you thought you brought, and that

10    you thought you got protection for.

11         MR. REINES:  That's right.

12         THE COURT:  All uses.

13         All right.  Now so, Mr. Nathan, can you respond to why

14    he didn't get protection from all uses?  Does SAP have

15    protection for all uses?

16         MR. NATHAN:  SAP has protection to --

17         THE COURT:  Currently?

18         MR. NATHAN:  SAP would have protection.

19         THE COURT:  If I enter a final injunction -- I mean,

20    if I enter a final order.

21         MR. NATHAN:  To the extent we have litigated a claim

22    in this Court?

23         THE COURT:  Yes.

24         MR. NATHAN:  And we lose on that claim?

25         THE COURT:  Yes.

CCEZSAPM                    Motion

1          MR. NATHAN:  I would assume.

2          THE COURT:  Okay.

3          MR. NATHAN:  I assume there is res judicata as to that

4     issue at least for -- well --

5          THE COURT:  Well, that's good.  I like that.  Hold on.

6     I'll write it down.  Okay.  So what's standing between it

7     strikes me that what's standing between all of us is two

8     things; a final judgment in the underlying DataTern action and

9     it turns out we should have taken the DataTern route, which was

10    to say just go into a stipulated final judgment based upon my

11    Markman, as opposed to the summary judgment route, wherein the

12    parties have complicated things, with all due respect, by

13    adding in two new arguments, which rose to the 56(d) motion.

14    And if I entered a final judgment, then SAP has broad

15    protection as to '402.

16         MR. NATHAN:  '402 or '502.

17         THE COURT:  '402 and '502, actually, because of your

18    concession that you don't have a infringement claim, which

19    you've told me.

20         MR. NATHAN:  But only with the limitation which Mr.

21    Reines initially articulated until the two of you got into a

22    colloquy.

23         THE COURT:  Well, no, you just said -- we just talked

24    about the fact that it would be broad protection as to the '402

25    patent, that it would be res judicata.  Let me go back -- can I

1    have the Court Reporter read it back just before where the

2    Court said hold --

3              (Record read)

4              THE COURT:  So as to the claim that you've litigated,

5    if I entered a final judgment, it would be broad protection as

6    to that if you lost, and that's just -- we're lawyers, that

7    would just be right as a matter of law.

8              MR. NATHAN:  To look at Second Circuit, all right, so

9    if we have identical issues, actual litigation and actual

10   decision on the issues actually right litigated, and fair and

11   full opportunity to litigate the issues, and then a judgment

12   based on that, I think that meets the standard.

13             The question is the extent of the scope of what's

14   happened, and the extent to which what the Texas customers are

15   doing has been litigated, and the argument is that it has not.

16   So I go back to, because I think it's the only place where

17   notwithstanding all of the representations about what's

18   obviously going on, what's really going on, what we would have

19   done here, and all of that's just hyperbole.  Because all

20   that's here is, so far, the allegation of what people, what

21   companies in Texas have been doing with the BusinessObjects

22   product, not what they're doing on their own, but only using

23   that product.  And I like the word off the shelf, because it

24   has a connotation to it, but I think you understand, right.

25   It's like, as I say, it's like taking quicken out of the box

CCEZSAPM                        Motion

1   and loading and it going ahead and using it.  But it's not more

2   than that, but there's no evidence.  And with all due respect

3   Mr. Reines has absolutely no idea what may come out of

4   discovery and litigation in Texas, not a clue.  But he wants to

5   represent to the Court --

6           THE COURT:  Well, but if this Court found that then

7   Kessler applied, that's when the tracing of the BusinessObjects

8   software back to SAP, not to John Doe.  If John Doe sells some

9   software application which you believe infringes on the '402 or

10  the '502 patent, you can go at it, okay.  That's different.

11          But as to SAP and its customers for the patents which

12  were litigated in this Court, if Kessler applies, then under

13  the Supreme Court precedent they would get protection, SAP's

14  customers, not John Does customers, just SAP's, because that's

15  what Kessler holds.  You disagree.

16          MR. NATHAN:  I think you need a different record than

17  you have before you in order to -- in order to have that

18  opinion.

19          THE COURT:  Well, can I ask was there another point

20  that you wanted to make, anything?  Because I was going to

21  actually now go into something like the cleanup stuff that, the

22  housekeeping stuff.

23          MR. REINES:  Your Honor, I would -- brief reply.

24          THE COURT:  Let me just see if he's got anything else

25  because I don't want to cut him off prematurely.

CCEZSAPM                        Motion

1          MR. REINES:  Oh, absolutely.

2          MR. NATHAN:  I don't know where you are on the

3     irreparable harm issue, but.

4          THE COURT:  Speak to me about the irreparable harm,

5     because I'll tell you where I am.

6          There are cases which stand for the proposition that

7     the harm to a company's good will is not compensable with money

8     damages, and I mean that's not surprising to you, right?

9          MR. NATHAN:  Correct.

10          THE COURT:  Okay.  So the proposition that customers

11     who believe that as customers of SAP, not of John Doe, that

12     they may be subject to infringement and lawsuits, they may then

13     go to a different supplier for a software application because

14     they think why, why take the risk.  So that is an impact on

15     good will.  It's not -- it doesn't require any leaps to get

16     there, so -- but tell me why that's not, or why that either

17     doesn't exist or why that's not in fact irreparable harm.

18          MR. NATHAN:  Let's start with the record.  The record

19     before you, completely bereft.

20          THE COURT:  No, I just got the an exhibit.  Hand it

21     up, court Exhibit 1.

22          MR. NATHAN:  And this says what, this says?

23          THE COURT:  I'm a customer, I'm being sued.

24          MR. NATHAN:  And I want you --

25          THE COURT:  To indemnify me.

CCEZSAPM                          Motion

1            MR. NATHAN:  Right.

2            THE COURT:  Yes.

3            MR. NATHAN:  So they don't tell you what customer,

4     they don't tell you what the claim is.

5            THE COURT:  They were going to tell me what customer

6     but they didn't want to show it to you.

7            MR. NATHAN:  That's fine, but the --

8            THE COURT:  They could show me.

9            MR. NATHAN:  No, no.  But the rest of that point is

10    there is -- first, there's nothing in here which talks about

11    the even the possibility that if you don't do this, I want all

12    my money back and I'm walking away, right.  That's the first

13    thing.

14            The second thing is this is one customer.

15            Third thing is there is, in --

16            THE COURT:  But --

17            MR. NATHAN:  There is an adequate remedy.

18            THE COURT:  Yes, but Kessler said -- I mean, and I

19    don't know the pin cite on this, but it says, the Kessler

20    Supreme Court says it would be difficult at law to prove the

21    adequacy of money damages.  That's part of the reason why

22    Kessler issues the injunction.

23            MR. NATHAN:  But they did it on a record.  And the

24    record included that the effect to be anticipated, the effect

25    to be anticipated was the actual effect of the Brightwiser suit

CCEZSAPM                    Motion

1    as shown by the statement of facts, and you have no statement

2    of facts so far which shows that -- well, there is more.

3    Kessler's customers ceased.  It's not they were going to stop.

4    It's not they threatened to stop.  They stopped.

5          THE COURT:  Well, are you suing any SAP customers

6    right now?  Yes?

7          MR. NATHAN:  Yes, they're customers in Texas.

8          THE COURT:  Okay.  And you're suing them for patent

9    infringement?

10          MR. NATHAN:  Yes.

11          THE COURT:  And you're suing them for patent

12    infringement on the '402, '502?

13          MR. NATHAN:  Yes.

14          THE COURT:  Okay, that's all I need for that.  You may

15    disagree, but I think that's all I need.  Because you've

16    conceded that you're suing customers of SAP on these patents.

17    We've got one who is already squawking.  You don't have to wait

18    until your good will is in the toilet before you can raise a

19    claim.  You can say that your good will is going to be

20    seriously impacted, the fact that the customers are being sued

21    on the '402 and '502 is -- doesn't take any leaps.

22          MR. NATHAN:  And so amenable to money damages?  I

23    mean --

24          THE COURT:  Are they amenable to money damages, good

25    will?  Isn't it --

CCEZSAPM                         Motion

```
 1        MR. NATHAN:  All they have to do, all they have to do,
 2   to the point you made earlier, is offer to pay them money.
 3        THE COURT:  What do they do about the customers who
 4   won't deal with them tomorrow who they don't even know if they
 5   exist, because those customers say --
 6        MR. NATHAN:  But --
 7        THE COURT:  -- every customer who deals with SAP gets
 8   sued and I don't want to be in that crowd.  I'd rather deal
 9   with --
10        MR. NATHAN:  Don't you have to have a record?
11        THE COURT:  The record I got from you.  I got the
12   yeses.  You're suing the customers, you're suing them on these
13   patents.  Those are concessions, right.  Do I have to wait for
14   these people to stop dealing with SAP, do you think?
15        MR. NATHAN:  If each one of these customers did what
16   this customer did, isn't there an amount of money that solves
17   the problem?
18        THE COURT:  Well, I guess the question is one of, with
19   good will cases there is often a situation where you're losing
20   customers, and there is a reputational pick.  And what the good
21   will cases talk about is you don't have to wait until your
22   reputation is gone.  There certainly are a number of customers
23   with lost profits you could quantify lost profits, but that's
24   not the part of it that's the issue.
25        MR. NATHAN:  But you don't have -- you have two
```

CCEZSAPM                    Motion

 1    sentences in a 20 something page brief about good will, two

 2    sentences.

 3              THE COURT:  Well, right.

 4              MR. NATHAN:  I mean, listen, we're not -- SAP is not a

 5    minor player in the software business, and they didn't hire Mr.

 6    Reines and his firm because they're a small player.  So the

 7    notion that none of their submissions offers any evidence of

 8    irreparable harm that, for which there is no adequate remedy at

 9    law, should speak volumes to the Court about their inability to

10    do so at this stage.

11              THE COURT:  Mr. Reines, what do you think, do you say

12    to that?

13              MR. REINES:  Your Honor, first let's start with

14    Kessler.  The issue in Kessler -- this is right at the end of

15    the last paragraph of the case -- was, well, what about money

16    damages.

17              THE COURT:  Well, he's saying Kessler was built on a

18    record.

19              MR. REINES:  Right.  Let me just -- the issue was

20    money damages and the Court said, Eldridge succeeds in his

21    suit -- here we go -- he may bring suits against others whether

22    he succeeds in one suit or not.  There may be, and there is

23    likely to be a multiplicity of suits.  It is certain that such

24    suits, if unsuccessful, would at the same time, tend to

25    diminish Kessler's sales and to impose upon him the expense of

1    defending many suits in order to maintain the right which, by

2    judgment, has already been declared to exist.

3            So just the expenditure of the legal fees dealing with

4    the indemnity and all of that is, itself, defined as

5    irreparable harm by the Kessler court.

6            MR. NATHAN:  Here's the problem with that argument.

7    Kessler starts out with a patentee suing for infringement,

8    suing the manufacturer for infringement and losing, and then

9    going after the manufacturer's customers afterwards.  This

10   occurred -- the suits that are pending in Texas have been

11   ongoing since long before SAP showed up.  And there just -- if

12   they can't make a record now that there has been, I mean where

13   was this long ago?  I mean, why are we any different today than

14   we were six months or two years ago?  It's because there is no

15   irreparable harm here because there are adequate money damages.

16   That's why, and it hasn't changed.

17           THE COURT:  All right, Mr. Reines, do you have

18   something else?

19           MR. REINES:  Yes.  Two points, your Honor, then I'll

20   be done.

21           THE COURT:  Then you'll be done?

22           MR. REINES:  Yes, promise.

23           THE COURT:  Okay.

24           MR. REINES:  The first one is, and I'm just going back

25   a little bit, but just to clarify.  The reason I was talking

CCEZSAPM                    Motion

1    about ordinary use was just because there had been a consent

2    about the out of the box and I was saying rather than use out

3    of the box, let's use something a little firmer, but always

4    arguing for the full breadth of what we're entitled to.

5    Related to that -- can you put up the -- what's just I think

6    finishes the issue of the scope of this case in this judgment

7    is the complaint -- actually the counterclaim -- where they're

8    suing our customers for our use.  So that was part of this case

9    was their allegation that our customers are infringing and

10   their statement that we don't have proof that our customers

11   aren't infringing through abnormal use of the product shifts

12   the burden.  The burden was on DataTern to come forward to

13   support its claims and to respond to our declaratory judgment

14   with proof.  So it's an improper burden shifting.  We can't

15   preclude the possibility that somewhere somewhere someone's

16   doing something.

17              MR. NATHAN:  We haven't gotten to trial yet, we need

18   to get past claim construction before we did that, okay.  We

19   did not succeed with claim construction --

20              MR. REINES:  Mr. Nathan, let me just finish.  I'm

21   talking about the scope of this case.

22              MR. NATHAN:  Right.

23              THE COURT:  Well, that's part of what's at issue with

24   June 27th, 2012 order.

25              MR. REINES:  I'm sorry?

CCEZSAPM                    Motion

1          THE COURT:  The June 27 order, in part.

2          MR. REINES:  Right.

3          THE COURT:  All right.

4          MR. REINES:  So.

5          THE COURT:  We know at least it includes

6     BusinessObjects.  The question is more than that.

7          MR. REINES:  Right.  It's just based on the use of

8     BusinessObjects, which is the language we used in our

9     injunction.

10         Then just moving to the irreparable harm.  So there is

11    obviously the good will, and being in fights with customers

12    about indemnity is, itself, blemishes your good will.  So the

13    level that's in the record is direct evidence, which is rare to

14    get because it's sort of an inchoate thing by its nature, that

15    degrades the good will we have customers that issues with them

16    about indemnity.  And then I would say beyond that all these

17    lawyers fees and all of this activity around it blemishes it.

18    So I think there is clearly record on irreparable harm.

19         And then like I say Kessler says inherent in a

20    litigation campaign about your customers, after you've won

21    which we now have, is irreparable harm.  That's how I read

22    Kessler and you can read as well as anybody.

23         THE COURT:  Last point.

24         MR. NATHAN:  Yeah.  If we were even approaching some

25    sort of avalanche of good will for at least by market cap, an

CCEZSAPM                      Motion

1    eight billion dollar company, you'd have more before you today.

2            THE COURT:  All right.  I think five motions is

3    plenty.  I am going to cleanup a few things which don't require

4    any argument.

5            I'll ask you about one of them in a moment, but I'm

6    prepared to rule whether or not you agree.

7            Okay, the first one is the -- I have before the Court

8    a motion to clarify the Court's order of June 27th, 2012.  And

9    the question is whether or not the Court intended to limit its

10   finding of summary judgment for noninfringement patent '402, it

11   was SAP's motion for summary judgment, only as to

12   BusinessObjects, and the answer is no.  I intended it to cover

13   the accused products, which included inter alia as it was

14   stated in the counterclaims themselves, inter alia

15   BusinessObjects.  So I went back to the counterclaims and I of

16   course confirmed that that is the language used in page nine of

17   the counterclaims or paragraph nine of the counterclaims, which

18   talks about different kinds of software and programming tools,

19   certain software and programming tools, the accused products.

20   And the Court's intention was as to patent '402, to capture

21   everything that SAP was -- could have been infringing relating

22   to '402, not just BusinessObjects.  So that motion has been

23   decided, the clarification has been given, and the Clerk will

24   be asked to close that motion.

25           The second issue is this one that is currently before

CCEZSAPM                         Motion

the Court, before I get to the motion for summary judgment.

Because if I issue a final judgment, it will divest me of

jurisdiction, so let me deal with this motion for preliminary

injunction before I get to the final judgment.

The Court has before it a number of papers which are

on the record. There's one document under seal. It's well

known to all parties what the standard for a preliminary

injunction or what an injunctive standard requires, either

under the regular injunctive standard or under Katz. Either

one this Court finds for the reasons that I'll now recite have

been met by SAP. The original lawsuits that were brought here

and counterclaims related broadly to both '402 and the '502

patents, which incorporated and included inter alia the

BusinessObjects software. The Court issued a Markman ruling in

August of 2012, and subsequent to that ruling in August of 2012

DataTern then stated, several times, but certainly it stated to

this Court in writing that in light of the Court's Markman

rulings, there were four different reasons why it could not

prevail on an infringement claim as to '402 and '502.

There was then discussion as between the various

parties as to what could be done to expedite the appeal of any

and all matters relating to the lawsuit currently before this

Court to the federal circuit. DataTern had suggested that

there just be a immediate certification, essentially, a final

judgment entered based upon its concession of an inability to

CCEZSAPM                          Motion

```
 1    show infringement.  There was the possibility, which is
 2    eventually what the parties engaged in, which was motion
 3    practice, wherein SAP and Microsoft more broadly sought summary
 4    judgment not only as to the inability of DataTern to show
 5    infringement based upon the Court's Markman ruling, but also
 6    based upon two other, on two other separate bases as well.
 7    Nevertheless, the Court, in reliance upon the fact that there,
 8    that DataTern would not be able to show infringement for '402
 9    and '502 does find that SAP is entitled to broad relief as to
10    the '402 and '502 patents.  It's not limited only to certain
11    uses, but to all uses of those patents.  It should be any and
12    all claims that would have or could have been brought in
13    connection with either the initial claims by SAP and/or the
14    counterclaims.  The Court relies, in issuing the injunction
15    that it's going to recite herein, on the Kessler case.  And the
16    Kessler is a case which has been the subject of much discussion
17    here today, and it does bar a patent infringement action
18    against a customer of a seller who has previously prevailed
19    against a patentee because of invalidity or noninfrigement of
20    the patent.  That is precisely the situation we currently have
21    before the Court.  So in terms of the first element of
22    injunctive relief of enjoining the lawsuit, enjoining DataTern
23    from pursuing lawsuits, either those pending or new lawsuits
24    relating to the '402 or '502 patents and relating to
25    BusinessObjects, the Court finds that there is a likelihood of
```

1    success on the merits that the Kessler court, the Kessler

2    Supreme Court found that.  Basically, it's the standard that

3    the Kessler case applied to this case indicates a very and

4    overwhelming likelihood of success on the merits, until this

5    Court's ruling, if it were ever to be overturned.  So since my

6    ruling is currently the ruling, Kessler indicates that there is

7    a very strong overwhelming likelihood of success on the merits.

8        In terms of the element of irreparable harm, the Court

9    also finds that element has been met.  There are difficulties

10   and uncertainties in quantifying the harm of customers who are

11   being sued for their use of a product, which the entity which

12   sold it to them has been found not to be infringing on the

13   suing parties' patent.  And the impact on the good will of

14   those customer lawsuits, SAP's customers, is uncertain and

15   difficult to quantify.  The Kessler case, the Court notes,

16   found that there was in fact a difficulty in quantifying the

17   impact on good will.  And the Kessler court also said it would

18   be difficult at law to prove the adequacy of money damages.

19   The Court adopts that rationale here.

20       The Court does not find that it is necessary in any

21   way to wait for there to be further impact on SAP prior to

22   enjoining DataTern from pursuing lawsuits any further.  Court

23   Exhibit 1 provides some evidence, as does the affidavit before

24   the Court of the in-house person which really goes to court

25   Exhibit 1.  Is that right?  What's that person's name?

CCEZSAPM                          Motion

1          MR. REINES:  Lisa Pacino.

2          THE COURT:  Lisa Pacino, her affidavit as well.  So

3    the Court does not find that the Court needs anything in fact

4    beyond what it has, as well as the representations of counsel

5    for DataTern that DataTern is in fact suing customers of SAP.

6    It is suing customers of SAP on '402 and '502 patents, and a

7    concession that sometimes impacts on good will can constitute

8    irreparable harm, in general.

9          In terms of balance of harms, the Court believes that

10   there should be a -- there is a -- clearly the balance tilts in

11   favor of SAP; that this Court has issued an order that should

12   have granted SAP with broad protection and that, therefore, the

13   balance of harms is in SAP's favor that a stay, essentially, of

14   the actions in Texas pending any appeals to the Federal Circuit

15   by DataTern, which might impact this Court's Markman ruling

16   and, therefore, change the landscape that we have, that stay

17   should not be -- should not negatively impact DataTern too much

18   if they decide to proceed.  If there is a reversal of all or

19   any portion of the Markman ruling, they can do so in due

20   course.

21         In terms of the balance of the equities, that falls

22   again also in favor of SAP, as well as the public interest,

23   because there is a public interest in having the Court's orders

24   be complied with and having precedent of the Supreme Court be

25   followed and having customers not be sued the Supreme Court has

1    said should not be sued.

2            So for all the foregoing reasons, the Court issues the

3    following order:  Going forward at this point, DataTern is

4    enjoined, as well as any and all attorneys or other persons in

5    active concert or participation with DataTern from directly or

6    indirectly charging infringement or instituting any further

7    action for infringement of the '402 patent or the '502 patent

8    against SAP or any of its customers, licensees, distributors,

9    users or suppliers for technology purchased from SAP.  The

10   Court will, accordingly, close the motion for the injunction.

11           Finally, what the Court does is it deals with the

12   motion for summary judgment and the motion under Rule 56(d).

13   The motion for summary judgment, I had asked at the beginning

14   whether or not counsel for SAP and Microsoft would withdraw

15   their two arguments which required additional discovery.

16           MR. REINES:  Your Honor, with respect to SAP, the

17   56(d) motion is not directed to SAP, because of the issues

18   we've been talking about all day.  So we don't have that issue.

19           With respect to the arguments that are contested in

20   the summary judgment motion, I would suggest, your Honor, at a

21   minimum dismissing them without prejudice as moot.  The

22   thinking being on appeal should lightning strike and the

23   federal circuit reverse on all four claim constructions, this

24   would give us alternative bases in the record, if the federal

25   circuit wanted to reach them to see that there are alternative

1    bases.  The Court doesn't need to decide them, sometimes they

2    can be helpful, sometimes it's not a good use of judicial

3    resources.  So obviously we leave that to your discretion,

4    that's a discretionary thing.

5            THE COURT:  Mr. Goettle?

6            MR. GOETTLE:  Your Honor, I guess I'm not clear on

7    when you say two other bases.

8            THE COURT:  There were the main -- the main basis for

9    the summary judgment motion was, as to '402 patent was the

10   concession by DataTern that it could not show infringement as

11   to '502 that it could not show infringement based upon the

12   Court's Markman ruling.  Microsoft then moved on two additional

13   bases as well.  DataTern then has said that it needs additional

14   discovery in order to prove up or disprove those because of the

15   way in which discovery was stopped.  And so as to those two

16   additional bases.

17           MR. GOETTLE:  Okay, your Honor, so I just want to be

18   clear about the bases in Microsoft's motion, because I actually

19   see them as three, aside from the concession of DataTern.

20   There is a group that falls under the Court's construction that

21   DataTern, more particularly DataTern's expert has not

22   addressed.  So they fall within the bounds of your

23   construction, but they're not within the bounds of DataTern's

24   concession.

25           And then the second category, which I think -- the

CCEZSAPM                      Motion

1    second and third category -- sorry, the third and fourth

2    categories related to proof problems of direct infringment, of

3    contributory infringement, of Microsoft scienter.  Those are

4    the subject, in my view, of DataTern's Rule 56(d) motion.

5              THE COURT:  Okay.  I'm sorry.

6              MR. GOETTLE:  No, no, your Honor.

7              THE COURT:  I was going to say, I'm looking at page

8    one of your brief where you talk about the DataTern failed to

9    adduce evidence that anyone, including Microsoft, used

10   Microsoft implicated software tools to directly infringe.

11   That's what you're talking about in terms of, right?

12             MR. GOETTLE:  I'm sorry that I don't have it with me.

13   What would help if you wouldn't mind, your Honor, can you read

14   me the next one?

15             THE COURT:  Second, DataTern failed to adduce evidence

16   to proffer the elements of the only infringement theory it

17   pleaded, indirect infringement which requires proof of more

18   than third party direct infringement.

19             MR. GOETTLE:  Your Honor, there is a section in the

20   report, in our opening brief that -- and I can't remember if

21   it's in the first one that you just read to me or prior to that

22   where we have two proposed findings of fact based on DataTern's

23   concession.  And then a couple paragraphs down we have about

24   six or seven more.  I'm sorry.

25             THE COURT:  No, it's okay.

CCEZSAPM                    Motion

1         MR. GOETTLE:  My only point, I just wanted to make

2    sure I understand that I'm getting the sense that the ruling

3    would pertain only to the concessions and not to the other

4    issues that Gupta did not address even under the construction.

5         THE COURT:  Right.

6         MR. GOETTLE:  Okay.  Your Honor, I agree totally with

7    Mr, what Mr. Reines has just said and we'd be happy to go that

8    route.

9         THE COURT:  All right.

10        MR. NATHAN:  Seeing a train that's moving in a certain

11   direction.

12        THE COURT:  Right, going back to your original

13   proposal, which perhaps we should have taken you up to begin

14   with.

15        MR. NATHAN:  And we've spent extraordinary amounts of

16   time and money getting to where we are now, and we would, at

17   the Court's request and at their request, and what we would

18   appreciate the opportunity to be heard on summary judgment.

19        THE COURT:  Well, on the first two, on the main basis

20   for summary judgment, which is your concession that you can't

21   prove infringement as to either '402 or '502, which disposes

22   with all counterclaims as well as all direct claims, we don't

23   need argument because, essentially, that's that.

24        I, frankly, never would have agreed to go down this

25   route had I understood that, you know, it could create some

1    side problems the Court had not anticipated in terms of the

2    Markman order and the concessions being considered

3    interlocutory, because they were until we reached the stage in

4    a final judgment.  We all have an interest I think at this

5    point in finality so that DataTern can do what it needs to do

6    to bring us up immediately, particularly in light of the

7    emergency motion that was just made that is now enjoining

8    DataTern, and I now enjoined DataTern from proceeding with

9    these customer suits.  As a result of that unforeseen motion

10   and unforeseen situation of which this Court was not aware

11   that was occurring in Texas, I think the Court needs to speed

12   along the situation.

13           In addition, the Court would need to seriously

14   consider whether or not there would be any -- it would take me

15   a little bit of time to deal with these motions, and if I have

16   to go through the bases, which weren't conceded.

17           As a result, the Court is prepared to do the following

18   and does do the following.  I hereby find summary judgment in

19   favor of Microsoft and SAP and any entities that were also

20   Microsoft and SAP, SAP America, Inc., et cetera.  We'll put

21   them forth in a written just summary order on the claims which

22   they brought in their lawsuits in this action on the basis that

23   this Court's Markman ruling in August of 2012 has led to a

24   concession by DataTern that it cannot prove infringement as to

25   either the '402 or the '502 patent on four separate bases, and

1    on the basis of that there is no longer any claim for this

2    Court to adjudicate.  On that basis, the Court finds summary

3    judgment in favor of SAP and Microsoft.

4            The Court denies as moot or did not find that it's

5    necessary to reach, but notes that they exist, the other bases

6    that are set forth in the various papers of the movants for

7    summary judgment herein, but the Court need not reach them in

8    order to enter a final judgment in this matter.

9            Based upon the Court's ruling on summary judgment, the

10   Court denies as moot the motion under 56(d) for discovery with

11   respect to summary judgment because the Court did not feel it

12   was necessary to reach the arguments for which discovery was

13   necessary.  The Court does not find that it needs to order any

14   discovery and, therefore, the 56(d) motion is denied also as

15   moot.  Again, if this Court, if this case comes back to the

16   Court in some form, I assume that many of these issues will be

17   back and live before the Court again.

18           Finally, there is the last motion is a motion to amend

19   counterclaims by DataTern.  In light of the Court's finding of

20   summary judgment, the Court also denies that as moot, and that

21   there is leave of course, as with all things, that if this case

22   does come back to this Court later on, the Court is not going

23   to foreclose DataTern from renewing a desire to amend its

24   counterclaims at the appropriate time, but will not allow

25   amendment at this point in time because of the late stage of

CCEZSAPM                          Motion

1    the litigation; namely, it's done.

2              Yes.

3              MR. NATHAN:  Your Honor, I don't mean to interrupt, if

4    I am.

5              THE COURT:  No, I'm done.  That was -- I'm all done.

6    So ordered.

7              MR. NATHAN:  The form of order, are you going to adopt

8    the form that we attached in September?

9              THE COURT:  I just -- my form of order is going to be

10   the recitation of the injunction I just read, and I'm going to

11   grant summary judgment in about a sentence and a half, just

12   like I did, and it's going -- I'm going to terminate all the

13   motions.  So it's going to be essentially what you've just

14   heard.

15             MR. NATHAN:  Okay.

16             THE COURT:  I just dictated it.

17             All right, is there anything else?  So this case can

18   go immediately on appeal, all right.

19             Anything else?  No?  All right, we're adjourned.

20   Thank you very much.

21             THE DEPUTY CLERK:  All rise.

22             (Adjourned)

23

24

25